UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------x

UNITED STATES OF AMERICA,              Case No. 1:20-cr-00008 (MKB)

        -against-                   **DECLARATION OF**
                                    **MICHAEL A. SCOTTO, ESQ**.


STEVEN NERAYOFF,
--------------------------------------------------x

      MICHAEL A. SCOTTO, ESQ., hereby declares, pursuant to 28 U.S.C. § 1746 and under the penalty of perjury as follows:

      1.      I am the attorney for defendant Steven Nerayoff ("Mr. Nerayoff") in the above-captioned case. I have represented Mr. Nerayoff in this action since May 25, 2022.

      2.      I submit this declaration based on my review of material provided to date by the government in discovery, material provided to the defendant by way of subpoena, conversations with relevant parties, and a review of video recordings, messages and emails between the defendant and Jane Doe, John Doe and other parties described herein.

      3.      The following facts are offered in support of Mr. Nerayoff's Motion to Dismiss the Indictment, Disclosure of Portions of the Grand Jury Proceeding and to Compel the Government to Provide Information in its Possession Which Support the Instant Motion.

      4.      These facts, based on indisputable video and audio recordings, text messages, emails, and analysis of telephone billing and use records of Michael Hlady ("Hlady") and Jane Doe not only **establish Mr. Nerayoff's actual innocence** they also **establish that his alleged co-conspirator Hlady was very likely an FBI informant.**  These items have either been in the

Government's possession since the inception of its investigation (and provided to Mr. Nerayoff in discovery[1]) or provided to the Government by Mr. Nerayoff since June 21, 2022.[2]

5.      Skype Business Meeting video recordings and other documents submitted in support of this motion establish that Mr. Nerayoff's negotiations with the alleged "victims," which are at the heart of the extortion allegations in the Complaint and Indictment, clearly establish that not only were the agreements entered into freely, the parties dealings were entirely cordial and that as argued in Mr. Nerayoff's Memorandum of Law in support of his motion, the indictment against him rests on false and perjured testimony and must be dismissed with prejudice.

6.      Moreover, telephone billing and use records for co-defendant Hlady's phone show that for the period January 31, 2018 through November 2018, Hlady, whom the government charged as Mr. Nerayoff's co-conspirator, had a total of 100 text messages and 45 telephone

---

[1] Documents in support of this motion that were obtained by the government are described by the identifier that the government or Company 1 affixed to the material when produced.  In drafting this statement of facts, I found that several documents which had been submitted to the government which supported our actual innocence claim had actually been in the government's possession since sometime in February 2019 – **seven months before** the government filed the Complaint in support of the September 17, 2019 Arrest Warrant for Mr. Nerayoff.  We know this as pdf documents provided by the government in discovery that came from Company 1 showed that the date they had been created, February 5, 2019 (see **Exhibit 1**: attached representative property tab for the Company 1 documents provided as pdfs in discovery).

[2] On June 21, 2022 Mr. Nerayoff provided the government with a flash drive containing emails, messages and three Skype Business Meeting video recordings made by Mr. Nerayoff that established that the parties business dealings were entirely lawful.  Most, if not all the exhibits in support of this motion directly identify the identities of the alleged victims whom the indictment names as John Doe, Jane Doe and Company 1. Although many of the  exhibits that identify the names of the alleged victims  come directly from Mr. Nerayoff, and were not provided by the government in discovery, those documents filed in support of this motion in the CM/ECF system have all been redacted to remove the alleged victims' names and/or to replace their actual names with Jane Doe, John Doe or Company 1 in order to comply with the spirit of the Court's Protective Order.  The three Skype Business meeting recordings, eight audio recordings made by the government during the investigation and unredacted copies of all the other exhibits that identify the alleged victims are being submitted separately to the Court and the government on flash drives. We are asking that the Court order the material contained on those flash drives sealed until further order of the Court.  We will also be submitting a bound courtesy copy of this declaration for the Court's use.  Additionally, although this motion does not seek a pretrial decision regarding the admissibility of these videos, recordings and documents, we submit that each exhibit to this motion that supports Mr. Nerayoff's factual innocence would in fact be admissible at a trial of this matter under Federal Rules of Evidence Rules 803(1), 803 (3), 803(5), 803(6), 803(7) and/or 807.

contacts with Federal Bureau of Investigation Special Agent Jordan Anderson ("S/A Anderson"), at the same time that Hlady was allegedly conspiring with Mr. Nerayoff to extort Company 1. [3]

7.      On February 10, 2023 at 5:17 p.m. I called AUSA John Enright in response to an email requesting I call him to discuss two separate discovery demands that Mr. Nerayoff had previously submitted. We spoke for a total of six minutes.  During the conversation AUSA Enright advised me that although his office would be sending me a formal written reply via email in the coming days he wanted to discuss some of the items we had requested. One such items was the text message activity between Hlady and S/A Anderson.  AUSA Enright informed me during the conversation that the government was not in possession of any of the 100 text messages between S/A Anderson and Hlady or any material related to those contacts.   I vividly recall AUSA Enright stating this as in response to his statement I replied, in sum and substance, that this was not the first time that text messages required to be preserved by the FBI[4] had been deleted.

---

[3] Telephone billing records provided by the government in discovery and obtained by the Defendant by way of subpoena show extensive contact between Michael Hlady, Mr. Nerayoff's alleged co-conspirator, and S/A Anderson, the FBI agent who was investigating Mr. Nerayoff.  In particular, a review of Hlady's phone records showed that for the period 1/31/2018 to 2/18/2019 a total of 100 texts and 45 phone calls (96 texts to/from S/A Anderson's cell phone, 24 voice calls to/from S/A Anderson's cell phone, 17 calls to/from the main line at the NY FBI Office, 4 calls from S/A Anderson's direct line and 4 texts with the FBI NY Office main line).  These are just the texts and calls to known numbers for S/A Anderson and the FBI and one of the two phones that Hlady apparently used.  The analysis below is based on *Call Detail Records* for Hlady and Jane Doe's cell phones provided by the government in discovery, as well as usage and billing records obtained by Mr. Nerayoff for both lines. The Call Detail Records use Coordinated Universal Time ("UTC") to reflect the times that calls or texts were sent or received.  Telephone billing records that we've obtained for Hlady's wireless phone are in Eastern Time.  For the sake of clarity and to sync with the times reflected in the recordings made by Agents from the Seattle Office of the FBI referenced below, all times have been converted to Pacific unless otherwise indicated.  Times of calls may be slightly off as Jane Doe's cellular device was on a different cellular network than Hlady's and Agents from the FBI were likely relying on personal time keeping devices to indicate the times of the calls they recorded.  Call times, when given, correspond to either the duration of a call in the telecommunication providers records in call details or time billed.  In some instances, short calls appear not to be reflected in the billing records although they appear in call data.  Calls made by Hlady which he was billed for may include calls the Call Detail Records did not capture as "roaming calls" on the T-Mobile network do not appear on the call detail records provided in discovery by the Government, but they do appear on Hlady's monthly T-Mobile bills that we've obtained.  Where there is a conflict in a call's duration, we have used the call detail duration as billed time may be rounded up to the nearest minute. All call times are approximate.

[4] See, "DOJ Policy and Guidance regarding Electronic Messaging Records Retention" See, Office of the Inspector General U.S. Department of Justice Report of Investigation of Text Messages from Certain FBI Mobile Devices (redacted) at p. 5-6 at https://oig.justice.gov/reports/2018/i-2018-003523.pdf

8.      I also recall AUSA Enright telling me that the government did have a Hlady device (I believe to be a reference to one of two Hlady cell phones that he used) and that they were reviewing it to make sure that Mr. Nerayoff would receive anything on the device that he was entitled to.  Later that evening I emailed AUSA Enright and AUSA Lax to ask them to confirm what I had heard, and then sent a second email seeking additional confirmation.  On February 11, 2023, AUSA Enright responded to my requests writing that "As to your first request, we're not going to confirm whether any such emails or texts exist given that any request for such information far exceeds the government's Rule 16 obligations.  We are thus not obligated to produce any such information…"[5]

9.      Additionally, telephone billing records for the same period show that Hlady and Jane Doe, his alleged extortion victim, secretly communicated prior to calls that Jane Doe was recording of Hlady under the supervision of agents from the Seattle Office of the FBI, in June and November of 2018 – calls in which Jane Doe and Hlady falsely implicated Mr. Nerayoff.

10.     Similarly, telephone billing records show that for the three days prior to Jane Doe secretly recording Hlady on November 21, 2018, that Hlady and S/A Anderson texted a total of seven times, and Hlady received calls of 5 and 2 minutes from the NY FBI Office and placed one call to the FBI main line and one to S/A Anderson's cell phone.

11.     While, at first glance, Mr. Nerayoff's claims might be viewed as "tin-foil hat material," (*see e.g. Elkins v F.A.A.*, 65 F.Sup. 3d 194 (2014) (D.C.), we submit that the indisputable facts described herein lead to the inescapable conclusion that Mr. Nerayoff's business dealings were entirely lawful, that the government knew this fact as early as February of 2019 – **seven months before they obtained a warrant for Mr. Nerayoff's arrest** – and that prior to arresting

---

[5] See: **Exhibit 2**: Email thread.

Mr. Nerayoff the government knew that Mr. Nerayoff had been the victim of a con by Hlady and not his co-conspirator, as not only had Hlady been providing the FBI information on Mr. Nerayoff's business activities, he also conned Mr. Nerayoff out of hundreds of thousands of dollars and Mr. Nerayoff provided a detailed Dossier, as described below, describing the elaborate con by Hlady against Mr. Nerayoff including senior government officials in the state of Rhode Island.

12.     These facts lead to one simple conclusion: that Mr. Nerayoff's dealings with Company 1 were entirely lawful, the allegations against him are in fact false, that the indictment obtained against him was the product of false testimony regarding material facts and that the government knew or should have known that it was presenting false testimony before the grand jury. Consequently, the Indictment must be dismissed as violative of Mr. Nerayoff's Fifth Amendment rights to Due Process and Grand Jury Indictment and that it must be dismissed with prejudice because the government knew or should have known it was presenting knowingly presented false testimony to the Grand Jury.

**BACKGROUND**

13.     Steven Nerayoff is an attorney, inventor and the founder and Chief Executive Officer ("CEO") of Alchemist Creations, LCC ("Alchemist"), a consultancy, accelerator and investment firm for high-potential blockchain companies and also controlled an entity called Maple Ventures LLC ("MV"), (Complaint at p.3, ¶3, Document 1 filed 9/17/19). Mr. Nerayoff also holds 45 U.S. and international patents[6] primarily in the field of artificial intelligence and has been credited as the inventor of the "utility token" and Initial Coin Offering ("ICO"), while at

---

[6] https://patents.justia.com/inventor/steven-david-nerayoff

Ethereum[7], and first "security token" and Security Token Offering ("STO"), while at tZERO[8], and had one of the widest networks of top players in the Crypto industry.

### Mr. Nerayoff meets John Doe and offers to help John Doe and Company 1

14.    On May 23, 2017, Mr. Nerayoff was introduced to John Doe at the annual Consensus Conference in New York City. John Doe asked Mr. Nerayoff if he would help Company 1 with an Initial Coin Offering ("ICO")[9] and mentioned that all the other Crypto consulting firms had already rejected Company 1.  Mr. Nerayoff watched John Doe's PowerPoint presentation and pitch, and they both agreed to continue to talk.

15.    On June 15, 2017, John Doe emailed Mr. Nerayoff telling him "Unfortunately the firm we were planning on hiring to launch our ICO for us demanded a payout that was too much and as a result we have had to delay 2+ weeks finding an alternative . . . I will continue to send you more updates as we move along." Mr. Nerayoff replied that he had "an ICO team that could help," and asked if there was still a possibility for Mr. Nerayoff to make a $50,000 equity investment in Company 1.

---

[7] https://www.scribd.com/book/465949432/The-Infinite-Machine-How-an-Army-of-Crypto-hackers-Is-Building-the-Next-Internet-with-Ethereum (Chapter 12 "The White-Shoe Lawyers"); see also **Exhibit 3**: Excerpt.

[8] tZERO is a subsidiary of Overstock.com, Inc. (NASDAQ: OSTK),

[9] An ICO or "crowdsale" was a fundraising event during which an entity offered participants a unique "coin" or "token" in exchange for consideration.  The tokens or coins were generally issued on a "blockchain" or a cryptographically secured ledger.  The tokens or coins were often paid for in "virtual currency."  ICOs were typically announced and promoted through the internet and email.  Issuers usually released a "whitepaper" describing the project and the terms of the ICO.  To participate in the ICO, investors were generally required to transfer funds to the issuer. After the completion of the ICO, the issuer distributed its unique coin or token to the participants.  The coins or tokens might entitle holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain services provided by the issuer and/or voting rights.  These coins or tokens might also be listed on online platforms, often called virtual currency exchanges, and might be tradable for virtual currencies (**Exhibit 4**: Complaint at ¶5).

16.     On July 19, 2017 Defendant Mr. Nerayoff, Jane Doe, John Doe and two associates of Mr. Nerayoff, Jeff Pulver and Carlo Vicari, met via Skype Video to discuss Mr. Nerayoff's proposal. Mr. Nerayoff recorded this meeting.[10]

### The Agreements between Mr. Nerayoff's Maple Ventures and Company 1

17.     On July 22, 2017, a contract was executed between Company 1 and Maple Ventures. The terms of the contract stated that 22.5% of cryptocurrency tokens sold and 22.5% of funds raised were to be paid to Mr. Nerayoff's company Maple Ventures.  However, as described in the following paragraphs, Mr. Nerayoff and Company 1 mutually agreed to void this contract.

18.     On September 10, 2017, Mr. Nerayoff, John Doe, Jane Doe, Jeff Pulver and Carlo Vicari met via Skype Business as all parties had learned that there was an error in a shared spreadsheet created by Jane Doe that involved Company 1 token calculations. Due to this error, the parties decided to renegotiate the deal terms.  Mr. Nerayoff also recorded this meeting.[11]

19.     On September 10, 2017, after the video conference, Jane Doe sent Mr. Nerayoff an email voiding the original July 22, 2017 agreement and offering Mr. Nerayoff two options on how to proceed. John Doe was cc'd on the email.[12]

20.     On September 11, 2017, Mr. Nerayoff replied to Jane Doe's email via Skype message in which Mr. Nerayoff informed Jane Doe that he would like to "take option #2 with

---

[10] **Exhibit 5**: Video recording of 7-19-2017 Skype meeting and **Exhibit 6**: transcript of 7-19-2017 Skype meeting.

[11] **Exhibit 7**:  Video recording of 9-10-2017 Skype meeting and Exhibit 8: transcript of 9-10-2017 Skype meeting.

[12] **Exhibit 9**: Company 1_document 016983 9-10-2017 Jane Doe to Mr. Nerayoff email.  This email establishes that the parties had agreed to void and rework the July 22, 2017, agreement because of a mutual misunderstanding, and that Mr. Nerayoff was indeed actually and factually innocent were provided to Mr. Nerayoff by the government on June 20, 2020. As noted above, the Adobe PDF properties tabs on each of the Company 1 documents that Mr. Nerayoff received from the government that are exhibits to this motion reveal that these documents were created by Company 1 on February 5, 2019— a pdf that the government had seven months before they arrested Mr. Nerayoff and eleven months before they indicted him.

either one of two variations b/c of all the people we have to pay." Mr. Nerayoff explained further "…I am 'requesting' either moving the ether to $16 million or moving the tokens to 750 million," as "a goodwill request. we are moving forward either way.[13]"

21.    From September 11 to October 31, 2017, Mr. Nerayoff repeatedly, and unsuccessfully, tried to get Jane Doe and John Doe to memorialize the new deal in a writing.

22.    On October 30, 2017, Mr. Nerayoff emailed John Doe with a summary of the new terms and cc'd Jeff Pulver.[14]   Mr. Nerayoff proposed terms that were acceptable to both him and Pulver and added "Jeff and I will continue to work with you on biz dev, strategy, business positioning and help you scale the business and you will have a New York office. We will bring on advisors as needed. We have only scratched the surface.  This is really the biggest compromise jeff is making bc of our commitments.  We do not have time to waste bc the guys have to be contacted etc.   I'm looking forward to building a great company together with you [John Doe]."

23.    On October 31, 2017 John Doe, cc'ing Jane Doe responded to Mr. Nerayoff and described his understanding of the deal.[15]   John Doe thanked Mr. Nerayoff for everything he had done for them, discussed his thoughts on where the deal should end up and noted that he thought Mr. Nerayoff's proposal was fair.  John Doe wrote in the email:

> First, I want to start off by saying thank you for everything you have done for us. Thank you. [Jane Doe] myself and the team cannot be more grateful for everything you've done to help us to become the ultimate blockchain project, together.

---

[13] **Exhibit 10**: Messages between Jane Doe and Mr. Nerayoff.

[14] **Exhibit 11**: Company 1_document 014702 10-30-2017 Mr. Nerayoff to Jane Doe email contained within an email thread. Like exhibit 9 these emails, and all the Company 1 emails which establish that the parties continued to discuss how to rework the July 22, 2017 agreement and that their dealings were not only business like but cordial were provided to Mr. Nerayoff by the government on June 20, 2020 in pdf form, a pdf that was created by Company 1 on February 5, 2019—a pdf that the government had seven months before they arrested Mr. Nerayoff.

[15] **Exhibit 11**:  Company 1_document 014702 10-31-2017 Mr. Nerayoff to Jane Doe email contained within an email thread.

John Doe's email concluded:

Again, we thank you and Jeff for your partnership and stewardship of this great opportunity in [Company 1]. We look forward to working together to make this project as big as possible. Thank you again, Steven!"

24.    On November 2, 2017, Mr. Nerayoff sent an email to Jane Doe and John Doe seeking to confirm his understanding of the deal terms.[16]

25.    Also on November 2, 2017, Company 1, contrary to the terms of their initial agreement, unilaterally changed the crowdsale terms by lowering the number of tokens Company 1 was selling from 206,000 Ether worth of tokens ($66.95 Million) to 120K Ether worth of tokens ($39 Million).[17] Company 1 stated to Mr. Nerayoff they did this due to a loss of investor confidence.[18]   Company 1's unilateral decision resulted in a loss to Mr. Nerayoff as his compensation in Ether received was based on the number of tokens sold by Company 1. Therefore, Company 1 could now sell only part of the tokens created by Mr. Nerayoff and keep the rest for sale on a later date, which they appeared to have done, and avoid paying Mr. Nerayoff his agreed compensation for the Ether received for the sale of those tokens.

26.    On November 5, 2017, Mr. Nerayoff emailed Jane Doe and John Doe to complain that they had made unilateral decisions which adversely impacted the deal that Mr. Nerayoff believed had been reached on November 1.[19]

---

[16] **Exhibit 11:**  Company 1_document 014702 11-2-2017 Mr. Nerayoff email to John Doe and Jane Doe l contained within an email thread.

[17] **Exhibit 12:** Company 1 Blog Post.

[18] **Exhibit 13**:  Blog Post regarding token allocution. Pie chart.

[19]  **Exhibit 14**: Company 1_document 014708 11-5-2017 email from Mr. Nerayoff to Jane Doe and John Doe. This email, which establishes that the parties continued to discuss how to rework the July 22, 2017 agreement and that their dealings were cordial was provided to Mr. Nerayoff by the government on June 20, 2020 in pdf form. When the pdf is opened and the properties function is selected it shows that the pdf was created, presumably by Company 1 upon a request by the government, on February 5, 2019—over seven months before the arrest warrant for Mr. Nerayoff was obtained.

27.     Later on November 5, 2017, Mr. Nerayoff and John Doe communicated via telegram messaging with Mr. Nerayoff was still seeking to get the deal he thought the parties had reached committed to writing. After hearing back from John Doe both men realized that were still not on the same page regarding what they had believed they agreed to. [20]

28.     Nevertheless, although the parties have not entered into a written agreement John Doe informed Mr. Nerayoff that the Smart Contract was being deployed and the crowdsale commencing.  After that exchange with John Doe, Mr. Nerayoff messaged Jane Doe to alert her to the situation.  Jane Doe suggested they discuss on Skype and sent electronic invitations to a Skype Meeting.[21]

29.     On November 6, 2017, Mr. Nerayoff, Jeff Pulver, Jane Doe and John Doe meet via Skype Business Video.  Jane Doe ran the meeting—the purpose of which was to get all parties to express what they believed the deal was or should be.  Moreover, at this point, Mr. Nerayoff had already performed the services that Company 1 had engaged him to perform.  After an extended and cordial discussion, all parties agreed to new terms:  Mr. Nerayoff would be entitled to 2.25 billion Company 1 tokens at the end of the crowd sale (1.35 billion of these 2.25 billion tokens were to be provided to Mr. Nerayoff on December 7, 2017, the day the crowd sale ended, and the remaining 900 million tokens would be held by Company 1 – or "delayed released" – and made available to Mr. Nerayoff no later than two years after the crowd sale ended). In addition, Mr. Nerayoff would also be entitled to 30,000 ETH from the pre-sale and that Mr. Nerayoff would be entitled to a 6,000 ETH bonus if the crowdsale sold out.[22]  This agreement was memorialized in

---

[20] **Exhibit 15**: telegram message from John Doe to Mr. Nerayoff.

[21] **Exhibit 16:** Jane Doe invitation to Skype Meeting, Company 1_028401.

[22] **Exhibit 17:**  Video recording of 11-6-2017 Skype meeting and **Exhibit 18**: transcript of 11-6-2017 Skype meeting.

the "Services Payment Agreement" between the parties, a copy of which was provided by the government in discovery.  As the video provided to the Court shows, the re-negotiations the parties engaged in on November 6, 2017 were cordial, cooperative and the parties agreement was not the result of threats of any kind, indeed Jane Doe noted at the minute fifty-seven, "you wanted 1.4 billion tokens plus the 30,000 more [UI] which is Eight hundred eight million.  **I'm saying we're going to give you more since we already wrote it down, 2.25 billion tokens so I don't know why you're arguing because you're getting more**." At the conclusion of the meeting, the video shows  Jane Doe describing both Mr. Nerayoff and Mr. Pulver as like family.[23]

30.     On November 6, 2017 after the recorded Skype Video meeting concluded, Jane Doe emailed[24] Mr. Nerayoff, Pulver and John Doe two pages of the presentation[25] she gave during the meeting confirm the new terms discussed during the video meeting.  In fact, Jane Doe wrote in the email with the mutually agreed attached terms:

"Thanks guys. Attached is what we agreed to this morning. HUGS.—Jane Doe."

The first page of the attachment was captioned "Jeff/Steve Getting on the same page," and included a to do list for Jane Doe and John Doe with tasks for them to perform as suggested by Mr. Nerayoff to make the crowdsale a success. The second page of the attachment, titled "New Deal," read in part:

"Tied to the hip. Mutual success.

---

[23] John Doe noting "...and they are going to continue being our dad's," to which Jane Doe said "Uncles," and then "You are like brothers to me. No, they are like brothers. They are my brothers."

[24] **Exhibit 19**: Company 1_document 014709 11-5-2017 Jane Doe email to Nerayoff, Pulver and John Doe.  This email, which establishes that the parties came to a new agreement through continued cordial discussions was provided to was provided to Mr. Nerayoff by the government on June 20, 2020 in pdf form. When the pdf is opened and the properties function is selected it shows that the pdf was created, presumably by Company 1 upon a request by the government, on February 5, 2019—over seven months before the arrest warrant for Mr. Nerayoff was obtained.

[25] **Exhibit 20:** Jane Doe's two pages of screenshots from 11-6-2017 Skype Video meeting.

Alchemist wants to hire a [Company 1] focused human on their team.

SO LET's GIVE STEVE/JEFF =2.25 billion [Company 1] tokens
This INCLUDES: 900,000,000 can be locked up
(if company can, less than 2 years is better for Alchemist)

INCUDES PLUS UP TO 1,350,000,000 [no lock up]
Alchemist keeps 30,000 ETH from presale
[Alchemist gets extra 6,000 ETH IF SELL OUT ONLY]"

31.     On November 7, 2017, the parties entered into a new agreement which reflected the negotiations from the day before.[26]  As displayed above, the terms of the agreement were entered into by both sides voluntarily and free of duress or coercion, facts that were not only contained in the three Skype videos but also were reflected in Company 1's own documents which they had provided to the government in February of 2019—seven months before the government decided to prosecute Mr. Nerayoff.

32.     Although the crowdsale was successfully concluded in December 2017, Company 1 refused to give Mr. Nerayoff any of the 1.35 billion tokens they owed him. This despite Mr. Nerayoff's multiple requests for his tokens and him providing Company 1 with fifty "wallet" address to send the tokens to.[27]  In fact, Company 1 included Mr. Nerayoff's wallet addresses and the number of tokens which needs to be sent to each address, in a spreadsheet it maintained which listed the addresses of everyone who was due Company 1 token.  To date, Mr. Nerayoff has not received a single token of the 2.25 billion Company 1 tokens to which he was entitled to under the November agreement.

---

[26] **Exhibit 22**: 11-7-2017 Service Payment Agreement.

[27] **Exhibit 23**: Spreadsheet of token holders with addresses to send tokens Mr. Nerayoff's addresses are listed at a tab entitled "Alchemist." Company 1_03402.

### Company 1's Loyalty (Airdrop) Program

33.     On December 1, 2017, Company 1 announced the creation of a "loyalty program," which was also sometimes referred to as the "air drop" or "drop". The purpose of the program was to awarded token holders who held their Company 1 tokens and did not sell them by giving them additional "bonus" tokens, allocated according to a formula.[28]   The loyalty program was supposed to be <u>available to all token holders on all their token holdings</u>.   But Company 1 only offered Mr. Nerayoff loyalty tokens on the 1.35 billion tokens he was due on December 7, 2017 and not the entire 2.25 billion tokens the November 7 agreement provided him with.[29]

### "Michael Peters" introduced to Mr. Nerayoff

34.     In or about January 2018 a longtime friend of Mr. Nerayoff introduced him to her new boyfriend, "Michael Peters." "Peters" and the friend claimed that "Peters" was a former government agent/contractor who had worked with the NSA, the FBI and the CIA. The friend suggested that "Peters" and his consulting company Northstar Ventures Corp. ("NSV") — which "Peters" claimed consisted of other former government agents[30] — could provide consulting

---

[28] **Exhibit: 24**: Blog Introducing [Company 1] Loyalty Program to Encourage Wider Mass Adoption..

[29] See, **Exhibit 25**:  December 4, 2017 Jane Doe text exchange with Mr. Nerayoff: "1.35B of Alchemist/Steve tokens are eligible for Company 1 Drop.  We are in agreement." Mr. Nerayoff replied back "What about the other 900 million?" and **Exhibit 26**:  December 5, 2017, Mr. Nerayoff texted John Doe: "Concerned that all my tokens including the 900 million will be in the drop program.  Jane Doe confirmed 1.35 billion but said you would confirm the 900 million.  I'm creating addresses now." John Doe replied in a text to Mr. Nerayoff: "We did the best we can on this. Because it's based on proportion of tokens owned you would benefit the most out of anyone from the air drop already."

Although both these exhibits are copies obtained from Mr. Nerayoff's device and not from the government's production of these same messages that is only because the copy that we received from the government is broken down into individual pdf documents for each line of the messages, rather than a single document.   That is to say that the government also had evidence of these communications in February of 2019 when Company 1 generated those pdfs.

[30] According to the agreement, "[t]he Team at North Star Venture Corp. (NSV) consists of professionals whose more than 125 years of combined experience in business development & Management, Crisis management, Communications, Strategic Planning, Security Evaluation & Plan Implementation and Funding Consultation cross into every industry, corporate, and government fields."  The agreement also claimed that "The North Star Venture team has been involved in providing consultation for corporations and deals with combined values exceeding $ Billion US all done behind the scenes in the utmost of confidentiality."  As noted below all those representations were lies.

services for Mr. Nerayoff, which primarily consisted of, ironically, vetting people that Mr. Nerayoff was meeting.

35.     On or about January 14, 2018, NSV entered into an agreement to provide consulting services to Alchemist. "Peters" was given an Alchemist email address and sometime later gave himself the title of Chief of Staff.[31]   In mid- February of 2018, Hlady met Jane Doe and John Doe at a conference that Mr. Nerayoff, Hlady, Jane Doe and John Doe were attending in Fort Lauderdale Florida.

36.     Mr. Nerayoff did not know until November 9, 2018 when Mr. Nerayoff found out that "Peters" was not former decorated government agent "Michael Peters," but rather he was Michael Hlady, a con man and convicted felon who had been released from prison in Rhode Island in late October 2017 after serving a prison sentence for defrauding nuns. After learning "Peters" was convicted con man Michael Hlady, Mr. Nerayoff messaged the friend who had recommended him:

> I cannot believe you put me in this mess and you knew.
>
> I only hired him bc you pushed me so much. I trusted him bc of you and you knew I should not. I know you knew and yet you didn't do anything. Unforgiveable.
>
> For 6 months michael has been saying he's buying [Company 1] and a whole bunch of other things none of them are true. One huge lie! And you knew I know you knew.

Mr. Nerayoff would later find out when he learned "Peters" true identity to be Michael Hlady and reported the con that had been perpetrated against him to the FBI.  From January 2018 to mid-November 2018 when Mr. Nerayoff learned he was the victim of a con man, he paid a total of $765,056.08 to NSV and others involved in Hlady's con.

[31] That "Peters" received an Alchemist email account although he was only a consultant is not exceptional.  As noted below, upon her request both Jane Doe and John Doe were also given Alchemist email addresses as the parties had been discussing Alchemist's acquisition of Company 1. The government knew as much as early as February of 2019 when it received a copy of an email John Doe sent to Mr. Nerayoff in which he confirmed he had received his alchemist email (**Exhibit 27**: Company 1_036090). Jane Doe was also given an Alchemist corporate credit card to use in anticipation of her coming to work for Alchemist either directly for Alchemist or through Alchemist's acquisition of Company 1. Also in March of 2018, John Doe was invited to join Alchemist's "daily stand-up meetings" as part of the Alchemist team (**Exhibit 28**: Company 1_001843)

You are not understanding it was all a big charade.

Michael ruined me by lying all along about [Company 1]. [32]  I could have sold it for hundreds of millions of dollars and now it's almost worthless. Now bc of whatever he did I cannot get them to talk to me and he will not tell me what happened or fix his mess. I need them to finalize my agreement and get my tokens.

This is the worst mistake of my life.

He's a two bit con artist.

How could you unleash this criminal on me!?


**Jonathan Lucas Investigation and first known contact between "Peters" and FBI**

37.     Sometime in January 2018 Mr. Nerayoff was contacted by Jonathan Lucas, an individual Mr. Nerayoff had met while working the tZERO[33] crypto project.  According to a January 8, 2018 article in the New York Post, Lucas was under criminal investigation for defrauding investors in connection with "Fantasy Markets," an ICO that Lucas was involved in.[34] While Mr. Nerayoff was not involved in the Fantasy Markets project, Mr. Nerayoff had entrusted money to a trader for a major hedge fund.  Lucas worked and traded for that trader and he had given Lucas Mr. Nerayoff's funds to manage, the account that the funds were placed in was in the Bittrex Crypto Exchange.

---

[32] Although Hlady assured Mr. Nerayoff that he was working on the details of the Alchemist-Company 1 merger that the parties had previously discussed this was also a con meant to string along Mr. Nerayoff so that NSV would continue to get paid, and also we believe to remain close to Mr. Nerayoff while Hlady was reporting to the FBI.

[33] tZERO is a subsidiary of Overtstock.com, Inc. (NASDAQ: OSTK), a company which Mr. Nerayoff was trying to arrange a relationship with Company 1 so that Company 1's tokens could be used to purchase items at the Overstock web site and become their loyalty program.

[34] https://nypost.com/2018/01/08/ceo-of-porn-cryptocurrency-disappears-with-investor-money/

38.     When Mr. Nerayoff found out that that Lucas had been fired because of the Post story, Mr. Nerayoff was concerned that his investment was at risk.  On January 29, 2018, "Peters," who had previously claimed he had an extensive network in the FBI, and had learned from Mr. Nerayoff about this concern, messaged Mr. Nerayoff , "I will know about the JL[Jonathan Lucas] issue today."  Serendipitously, the same day, Lucas provided Mr. Nerayoff with a text message "[t]he guy who is investigating fantasy market is named Jordan Anderson. He's a special agent with NY branch of the FBI." Lucas' message also included S/A Anderson's direct line at the NY FBI as well as his cell phone and email and claimed that a friend had provided him with S/A Anderson's information.  Mr. Nerayoff forwarded this information to Peters believing he had contacts at the FBI which could determine if Mr. Nerayoff was being defrauded by Lucas.

39.     From January 31, 2018, the first known interaction between Hlady and S/A Anderson[35], through February 21, 2018, "Peters" and S/A Anderson engaged in a total of 23 calls, voice messages and texts (as noted above, records of which the government first orally said do not exist and then wrote "we're not going to confirm whether any such emails or texts exist given that any request for such information far exceeded the government's Rule 16 obligations")..

40.     On February 21, 2018 S/A Anderson sent "Peters" (at his alchemist email: Michael@alchemist.com) and Mr. Nerayoff an email inviting them to a conference call later that day with the "FBI/DOJ/SEC."

---

[35] Hlady's first known call to S/A Anderson was to his cell phone at 8:38 p.m. at night, followed by a call to S/A Anderson's office line. Although we currently have no evidence that Hlady had spoken with S/A Anderson prior to the activity we've detected in phone analysis, it does seem of some note that the apparent first contact between Hlady, a convicted felon, only released from state prison in Massachusetts some three months prior, and with a pending felony case in Rhode Island, was a cold call to an FBI agent at 8:38 in the evening.  On June 18, 2018, although Hlady was a prior felony offender, his Rhode Island felony matter was reduced to a misdemeanor and he entered a nolo contendere plea, receiving a sentence of merely one year probation and a judgment of $30,093 in restitution—which he apparently paid off with monies he received from his con of Mr. Nerayoff. Hlady was represented by Rhode Island attorney John Harwood in this matter.

41.     The SEC's interest in Mr. Nerayoff continued throughout his interaction with Company 1 and "Peters," as two enforcement attorneys from the SEC participated in a February 27, 2018 interview of Mr. Nerayoff described below and a March 2019 interview of "Peters," both which included S/A Anderson, and AUSA Mark Bini. We believe that the investigation into Mr. Nerayoff was a joint one between the SEC, DOJ & FBI and was part of then Attorney General Jeff Session's Cyber-Digital Task Force within the U.S. Department of Justice and the Department's stated desire to "continue to evaluat[e] the emerging threats posed by rapidly developing cryptocurrencies that malicious cyber actors often use."[36]   The dial in was for 4:15 p.m. on the 21st.   When Mr. Nerayoff forgot to call in at the appointed time, S/A Anderson and "Peters" exchanged a series of phone calls and texts. At 5:02 p.m. "Peters" texted Mr. Nerayoff "you're gonna need to speak to FBI soon."

42.     On February 23, 2018, S/A Anderson called Mr. Nerayoff directly.  Mr. Nerayoff recorded this call which lasted approximately thirty minutes.  During the call, S/A Anderson told Mr. Nerayoff "I've been talking to a colleague of yours, Michael Peters…"[37]  S/A Anderson then proceeded to state that "Peters" was providing information regarding Mr. Nerayoff's interaction with Lucas.  The story that S/A Anderson allegedly received from "Peters" however, was not

---

[36] See, Report of the Attorney General's Cyber Digital Task Force: Cryptocurrency Enforcement Framework. https://www.justice.gov/archives/ag/page/file/1326061/download.

[37] S/A Anderson's reference to "Peters" providing information to the FBI served to legitimize "Peters" as the former federal agent he claimed to be.  No doubt the government will concede that the FBI is the pre-eminent law enforcement agency in the country and that the requirements to become a Special Agent include having "a bachelor's degree and at least two years of full-time professional work experience, or hav[ing] an advanced degree and at least one year of full-time professional work experience." In short, the FBI is the pre-eminent law enforcement agency in the country, because it doesn't hire stupid people.  It is inconceivable that S/A Anderson, who had already texted and/or spoken with "Peters" on 23 occasions prior to his call with Mr. Nerayoff did not know that "Peters" was Hlady, therefore we believe that the only logical conclusion that can be drawn from these facts is that S/A Anderson knowing full well who Hlady was, used the name "Peters" to protect his informant. Indeed, notwithstanding the extensive contact between Hlady and S/A Anderson the government informed me that not a single of the 100 texts between the two was preserved by the FBI and the records we've requested regarding Hlady's status as a government informant or information that he provided during those calls and/or texts either do not exist.

accurate and Mr. Nerayoff told S/A Anderson as much.[38]   After correcting S/A Anderson, Mr.

Nerayoff told S/A Anderson what he knew about Lucas.  Mr. Nerayoff also asked S/A Anderson

if he was involved in investigating crypto crimes.  S/A Anderson replied his unit encompasses

crimes related to crypto to which Mr. Nerayoff mentioned that he was working with legislators to

"keep the industry respectable.".[39]   S/A Anderson then asked Mr. Nerayoff to meet with him on

February 27th at noon as "Peters" told him that Mr. Nerayoff would be in town that day.   S/A

Anderson concluded the call by telling Mr. Nerayoff he would email to set up the meeting and cc

AUSAs Mark Bini and John Enright[40], the two Assistant United States Attorneys whom S/A

Anderson said were assigned to the case.  S/A Anderson failed to mention that any representatives

from the SEC would be at the meeting.

43.     On February 27, 2018, Mr. Nerayoff met, at the United States Attorney's Office at

Cadman Plaza, with S/A Anderson, another agent from the FBI, AUSA Bini, Martin Sullivan (a

Special Agent with the United States Attorney's Office), and John Daniel and Cynthia Matthews

senior attorneys with the SEC's Division of Enforcement.   "Peters" drove Mr. Nerayoff to the

meeting.  Records for "Peters" cell phone show that "Peters" called S/A Anderson two times and

also texted S/A Anderson four times (texts which the government first orally said do not exist and

---

[38] S/A Anderson thought Mr. Nerayoff had invested in Fantasy Market, however, Mr. Nerayoff actually gave Lucas money to invest in the market.  S/A Anderson's 302 from his conversation with Mr. Nerayoff leaves out mention of "Peters" providing information on Mr. Nerayoff's supposed dealings with Lucas. But for Mr. Nerayoff's recording of the call, we would have no proof of this fact.

[39] See e.g. **Exhibit 29**, October 10, 2018 email with personal note from Rep. Warren Davidson, (OH-8) thanking Mr. Nerayoff for participating in the Congressman's "…roundtable, "Legislating Certainty for Cryptocurrencies," and noting "[t]he United States needs regulatory certainty that will allow this sector to thrive, innovation to flourish, and safeguard consumers from fraud.  With your help we can end the broken status quo of uncertainty, regulation by enforcement, and patchwork court rulings. As we work toward draft legislation, please continue to share you input with our office."

[40] Enright, a Senior Counsel at the SEC's Enforcement Division, had apparently been designated a Special Assistant United States Attorney sometime earlier (see https://www.justice.gov/usao-edny/pr/investment-adviser-convicted-defrauding-investors).

then wrote "we're not going to confirm whether any such emails or texts exist given that any such information far exceeds the government's Rule 16 obligations") prior to the meeting. Although Mr. Nerayoff was led to believe that the meeting was about Lucas potentially defrauding Mr. Nerayoff, the questions he recalls being asked (as confirmed by the 302 report of the interview[41]), were more about Mr. Nerayoff's involvement in the crypto industry than Mr. Nerayoff's giving money to Lucas to invest using Bittrex.[42]  While Mr. Nerayoff, S/A Agent Anderson, the AUSAs and the SEC attorneys were in the interview, "Peters" called S/A Anderson three times and texted him once (a text which the government first orally said do not exist and then wrote they could not to confirm or deny the existence of said texts as defendant was not entitled to them), and incredibly **S/A Anderson called "Peters" once during the interview**.[43]

44.    At the conclusion of the meeting, Mr. Nerayoff received a subpoena issued by an Eastern District of New York Grand Jury which sought documents in his possession relating to

---

[41] The prefix "318" for the file number reflected in the 302 refers to Corporate Fraud; Prime Bank and High-Yield Investment Fraud, Insider Trading, Market Manipulation investigations. In January of 2018 Mr. Nerayoff received a subpoena for an SEC investigation related to Kin a company he invested in. The SEC's interest in Mr. Nerayoff and Kin continued at least through September of 2018.

[42] Although later it seemed that the government had other interests in Mr. Nerayoff's dealings with Lucas: on March 25, 2018 Lucas left a voice message for Mr. Nerayoff in which Lucas stated in sum and substance that although both Lucas and Mr. Nerayoff had done nothing wrong in connection with the "Bittrex thing," then under investigation, because "anti-money laundering is a big deal," and that they needed to get on the same page before Lucas' attorney got back in touch with the government.  Obviously, Mr. Nerayoff did not return Lucas' message and Lucas later informed Mr. Nerayoff that he was asked by the FBI to secretly record calls with Mr. Nerayoff.

[43] Although the government first acknowledged that none of the 100 texts currently exist, and later refused to confirm or deny if the FBI currently has any of the 100 text messages, or indeed any other communications between the two, we believe that these texts from Hlady to S/A Anderson involved requests to end the meeting as Hlady had been texting Mr. Nerayoff during the meeting reminding him that they had to drive to Rhode Island that day to meet with Rhode Island attorney John Harwood who "Peters" had recommended to Mr. Nerayoff as someone who could help Mr. Nerayoff's company Alchemist in Rhode Island.  Harwood who was a former speaker of the Rhode Island House, ultimately assisted Mr. Nerayoff's overtures to Rhode Island Governor Gina Raimondo to make Rhode Island the Crypto Capital, and also introduced Mr. Nerayoff to United States Senator Sheldon Whitehouse of Rhode Island.  It is unclear if Harwood knew about Hlady's interaction with S/A Anderson. It is also unclear why Harwood, who was retained to represent Mr. Nerayoff failed to inform Mr. Nerayoff that Michael Peter's, was actually Harwood's former criminal defense client convicted felon Michael Hlady, and allowed Hlady to get close to Gov. Raimondo and Sen. Whitehouse and serve as a Master of Ceremonies for a Rhode Island Crypto conference that Raimondo attended and spoke at.

Jonathan Lucas (including all text messages between Mr. Nerayoff and Lucas)-the subpoena required that Mr. Nerayoff provide the documents by March 21, 2018.[44]  Shortly after the meeting, "Peters" and S/A Anderson texted or called each other a total of  4 times (once again, texts which the government first orally said did not  exist and then wrote "we're not going to confirm whether any such emails or texts exist given that any request for such information far exceeds the government's Rule 16 obligations").

45.     On March 19, 2018, days before Hlady allegedly attempted to extort Company 1 of cash and tokens as described in the Complaint[45], Hlady placed a call to S/A Anderson's direct line at the NY FBI Offices.  This call lasted five minutes and 28 seconds (there also appears to be no record of this phone contact involved in the possession of the government, although if it did exist it appears that the government would also simply neither confirm nor deny whether the record exists).  Later that day Mr. Nerayoff emailed S/A Anderson asking for an extension of time to respond to the Lucas Grand Jury Subpoena. Mr. Nerayoff wrote:

> "I am sorry I did not have the time to speak with you personally today, but I understand (and appreciate) you and the US Attorney Bini's willingness to provide me a two week extension in compiling all of the information you requested in regards to Johnathan Lucas. As I understand it my new date to testify in front of the Grand Jury is Wednesday, April 4, 2018.  As we spoke about in the past, I will be providing you all of the documentations as soon as possible so that you may continue your process.  It is my hope that the documentation that I provide will be enlightening enough such that I will not have to testify to the Grand Jury."

---

[44] It was this same month, February of 2018 that the SEC started an investigation of the entire crypto industry, purportedly sending out 180 subpoenas to individuals in crypto seeking information on the industry.   One of the individuals whose company was not subpoenaed went public that the SEC sent his company a letter which requested cooperation into the broader crypto investigation which had begun and included a request for information on the Zero project that both Lucas and Mr. Nerayoff had worked on.  https://www.deepcapture.com/2019/11/the-sec-me-metoo-part-deux/

[45] Exhibit 3 at ¶24.

46.     On March 20, 2018, rather than directly email Mr. Nerayoff, AUSA Bini sent S/A Anderson an email asking him to forward it to Mr. Nerayoff.  While AUSA Bini's email granted the postponement Mr. Nerayoff sought, AUSA Bini wrote "Mr. Nerayoff: we understand from your representative Mr. Peters that you need additional time to comply with the grand jury subpoena served upon you on February 27, 2018.[46]" Oddly, it was Mr. Nerayoff who had requested additional time in the previous day's email (which did not include "Peters") yet AUSA Bini stated this request for additional time came from "Peters" and whom he referred to as Mr. Nerayoff's "representative."

### The 10,000 ETH "loan"

47.     Although at the conclusion of the crowdsale, on December 7, 2017, Company 1 was required to transfer at least 1.35 billion tokens (of the 2.25 billion total tokens that agreement provided for[47]) to Mr. Nerayoff, it did not. Rather, Company 1 held all of Nerayoff's 2.25 billion tokens in Company 1's public "wallet."

48.     From on or about December 7, 2017 to mid-March 2018 Mr. Nerayoff, both personally and through his then counsel, made repeated requests for Company 1 to provide him the 1.35 billion tokens due to him under the November 6, 2017 agreement, but John Doe and Jane Doe refused to abide by the terms of the November 6, 2017 agreement.  During this period the value of Company 1's tokens fell drastically.

---

[46] AUSA Bini also stated in this email production of the responsive records (i.e., all text messages with Lucas) may eliminate the need for personal appearance in the grand jury.

[47] As noted *supra*, although Mr. Nerayoff was entitled to all 2.25 billion tokens at the conclusion of the token sale, the parties November 7, 2017 agreement allowed Company 1 to issue Mr. Nerayoff those 900 million "no later than the two year anniversary from the end of the token sale."

49.      On December 7, 2017, each of Mr. Nerayoff's 2.25 billion Company 1 tokens were worth 1.1 cent. On January 9, 2018, Company 1's tokens traded as high as 24.66 cents each making the value of the 1.35 billion tokens that Company 1 was required to provide to Mr. Nerayoff at the conclusion of the crowdsale on December 7, 2017 to have been worth $332,910,000.00.[48] By March 1 2018, however, Company 1's token were trading at 3.15 cents — representing a loss of 87% in the value of the Company 1 tokens that Mr. Nerayoff was entitled to.[49] During the month of March 2018 Company 1's tokens traded for anywhere between 1.9 and 8 cents.[50]

50.      On March 20, 2018, after continuing to refuse to provide any of Mr. Nerayoff's 1.35 billion tokens John Doe messaged Mr. Nerayoff.  John Doe had a proposal:  instead of releasing Mr. Nerayoff's tokens to him, Company 1 might be able to provide Mr. Nerayoff with a 'loan' to provide Mr. Nerayoff with something of value for the tokens it was holding.   John Doe messaged Mr. Nerayoff a copy of John Doe's "to do" list, which included: "[John Doe] to get back to Steve regarding loan after projections are completed."[51]

51.      On March 21, 2018, John Doe revealed to Mr. Nerayoff in a message that the reason Company 1 could not provide Mr. Nerayoff with any Company 1 tokens was because no one knew Mr. Nerayoff was the owner of 2.25 billion tokens held by Company 1 in its public wallet.

---

[48] This figure only represents 60% of the value of all 2.2 billion tokens that Mr. Nerayoff had earned at the conclusion of the crowdsale (not including additional Company 1 "loyalty" tokens).

[49] This 87% decrease represented a loss of $290,385,000.00 in just the value of the 1.35 billion tokens that Company 1 should have released to Mr. Nerayoff immediately upon conclusion of the crowdsale.

[50] Historical prices that Company 1 tokens traded at and which are described in this section were obtained from: https://coinmarketcap.com/currencies/[Company 1 name]/historical-data/

[51] **Exhibit 30**: Messaging between Mr. Nerayoff and John Doe.  Although this exhibit was generated from Mr. Nerayoff's device and not from the government's production of these same messages that is only because the copy that we received from the government is broken down into individual pdf documents for each line of the messages, rather than a single document.  That is to say that the government also had evidence of these communications in February of 2019 when Company 1 generated those pdfs.

Consequently, any transfer of token by Company 1 would be scrutinized extensively by the public.

In particular, John Doe admitted in a text message to Mr. Nerayoff:

> "There's no way to distribute it out… People are constantly watching."  John Doe continued, "[i]f we do the airdrop tokens to your wallet addresses it will cause 100% noise.  Steve you really need to work with us for the long term.  You are the single largest holder.  If you try and do the airdrop[52] I guarantee you there will be no [Company 1] left.[53]"
> John Doe cautioned Mr. Nerayoff:

> "Steve, you're risking your entire investment.
> There's no one who even comes close to you.
> I don't even own any [Company 1]
> None of the Founders even."

52.     John Doe included in the messages with Mr. Nerayoff a Company 1 Telegram Message post in which a user noted the discrepancy in a previous pie chart's token allocation that was posted by Company 1 on its blog to the allocation that Company 1 released prior to the crowd sale.[54]

---

[52] The "Air drop" tokens are a reference to the loyalty program tokens that Company 1 would issue directly to the token holder's crypto wallet.

[53] John Doe's fears about what outside scrutiny of Company 1 might bring were partially realized when Washington State filed civil charges against Company 1 for defrauding investors in connection with the ICO (See **Exhibit:31**). By that filing, Washington State accused Company 1 et al of, inter alia, promoting Company 1 Tokens' value as investments rather than its value as a utility coin to be used on Company 1's app (¶5), and promoting [Company 1] tokens as investments after the crowd sale (¶7) thus misleading investors. As such Washington State's filing alleged that Company 1 violated securities laws of the State of Washington as Company 1 wase engaged in the sale of unregistered securities (Conclusions of Law, at p. 4-5 ¶¶1-5).  To be clear, Mr. Nerayoff had no role in the illegality alleged by Washington State authorities, rather the conduct appears to have been engaged in by those individuals at Company 1 in management who had control of the company's website, social media accounts and the distribution of the Company 1 tokens. Mr. Nerayoff's role was limited to creating the utility token and working with Company1's attorneys at Perkins Coie in drafting the white paper—which appears to be the only part of the ICO that Washington State found no fault with, as they noted the White Pape "focused almost exclusively on [Company 1] Token's anticipated role as a utility coin and the community of users that [Company 1] wished to create" (Fn. 3 at p. 4).  As the securities laws in Washington State appear to be very similar to Federal Securities law it is unclear why the SEC and/or DOJ did not initiate federal enforcement or criminal actions against Company 1 as they were intimately familiar with the ICO, it being at the center of the prosecution of Mr. Nerayoff that they worked on.

[54] See Exhibit 13:  Blog Post regarding token allocution Pie chart.

53.     The discrepancy in the pie chart was that Company 1 concealed the fact Company 1 both misstated the amount of bonus tokens that presale buyers had received and concealed the fact that 2.25 billion tokens which the pie chart showed were Company 1 assets actually belonged to Mr. Nerayoff, this notwithstanding the fact that Company 1's internal financial records at that time truthfully acknowledged that Mr. Nerayoff's tokens were a $150 million liability on Company 1's 2017 year-end balance sheet although the tokens value went as high as $600 million in subsequent months.

54.     Copies of the initial and restated balance sheets were included in the discovery provided by the Government and were thus available to the government prior to Mr. Nerayoff's indictment.[55]   About the same time, Company 1 also kept two internal excel spreadsheets, which were once again provide in discovery, which show that after the crowdsale, Company 1 falsely reclassified Mr. Nerayoff's token liability on its balance sheet to assets of Company 1 (reserve tokens) apparently to match the information that Company 1 had provided to the public in the pie chart of token allocation.

55.     On March 27, 2018, Mr. Nerayoff, John Doe, and Jane Doe engaged in a series of telephone conversations discussing Company 1's failure to provide Mr. Nerayoff with any of the tokens he was entitled to.   During those conversations, Mr. Nerayoff, who had seen the value of his holdings plumet by over 80%, told John Doe and Jane Doe that he would sue Company 1 if continued to refuse to provide him some value for the tokens due to him.[56]

---

[55]  See: **Exhibit 32** Company 1 12/31/17 Balance Sheet showing a liability to Mr. Nerayoff and **Exhibit 33**: Company 1 4/30/18 Balance Sheet showing the money moved over to Retained Earnings.

[56] This intention to use appropriate legal process is confirmed by messages between Mr. Nerayoff and Jeff Pulver on March 21, 2018, in which both men discussed filing a lawsuit, if Company 1 did not live up to its agreement and a July 26, 2019 draft complaint that a law firm that Mr. Nerayoff retained produced—copies of both were provided to the Government on June 21, 2022.

56.     On March 28, 2018, sometime after midnight while the parties were still discussing the issue, John Doe proposed that Company 1 "loan" Mr. Nerayoff 10,000 Ether, secured by 70 million of 350 million loyalty program tokens that Mr. Nerayoff was entitled to.  Mr. Nerayoff agreed.

57.     On March 28, 2018, at approximately 9:00 a.m., Hlady upon his own initiative sent the following text, upon which the alleged 10,000 ETHER extortion scheme apparently rests:

> [Jane Doe] fix this by the time I land or I promise I will destroy your community. (1) we will go public with Stevens holding. (2) we will sell and get everyone we know to sell. (3) we will sue you. (4) a story will be written about [Company 1]. You are stalling for stalling's sake. I will be landing in 4hrs I expect you and [John Doe] on the phone. Also I want the "manual[57]" you wrote today!!

58.     Later on March 28, 2018, Mr. Nerayoff memorialized the terms of the agreement in a text message he sent to Jane Doe[58]:

> "It's just a matter of fairness. In the end I want the tokens not the ether but it needs to be fair. It's about 70 million should be as collateral. It's a right thing but practically it won't matter.[59] You understand how I operate it's about what is right and what was promised. So 350 million is way less than I would have received but I'm willing to find a medium."

Jane Doe replied and confirmed:

> "We send 10.000 ETH as 'loan '. We have 70.000.000 tokens as collateral."

59.     In later texts that same day, Mr. Nerayoff texted Jane Doe to remind her about issues relating to Company 1 that the two were working on for the betterment of Company 1:

> "[n]eed appointments for investors and joint ventures (like with UpBit) for April 7-9[60],"

---

[57] A reference to the work that Jane Doe was doing for Alchemist in connection with the Alchemist-Company 1 merger.

[58] **Exhibit 34:** Nerayoff text sent to Jane Doe.

[59] A reference to the fact that Alchemist was going to acquire [Company 1].

[60] A reference to the parties upcoming trip to Korea to promote Company 1.

"Micropayments Platform," and TZERO announcement.[61]"

60.     On March 31, 2018, Mr. Nerayoff emailed Jane Doe and John Doe reconfirming

the terms of the loan and giving up his right to fully participate in the Loyalty Program entitled

him to an additional 350 million tokens for a total of 2.6 billion tokens[62]:

> This is to confirm that I will receive 350 million tokens out of the user pool and
> relinquish my right to participate in the token drop.  [Company 1] has sent me
> 10,000 ether and is keeping 70 million out of my total tokens which equal 350
> million out of the user pool, 1.35 billion earned from the [Company 1] raise not
> subject to any lockup and 900 million [Company 1] earned from the raise subject
> to a two year lockup from the date of our previous agreement or a total of 2.6 billion
> tokens due to me.  I can choose to repay the loan of the 10k ether or simply forfeit
> 70 million tokens in satisfaction of the loan instead at any point.
>
>  Please confirm if this is correct.

61.     In agreeing to accept the 10,000 ETHER as a 'loan' rather than the 1.35 tokens then

due to him, Mr. Nerayoff also agreed to accept only 350 million Company 1 loyalty tokens, rather

than the estimated 700 million owed him for his full holdings, and pledged 70 million of those

loyalty tokens against the Ether 'loan," with the option that he could return the Ether and keep the

tokens or choose to keep the Ether and forfeit the 70 million Company 1 tokens.

62.     On March 31, 2018, the 10,000 ETHER that Mr. Nerayoff received was worth

about $3.95 million,[63] the 70 million bonus tokens that Mr. Nerayoff pledged as collateral were

worth approximately $2.7 million and the 350 million tokens that Mr. Nerayoff agreed to forego

were worth $13,569,500. In addition, Company 1 was still holding all 2.25 billion of his tokens.

---

[61] As noted above, tZERO is a subsidiary of Overstock.com, Inc. (NASDAQ: OSTK), a company which Mr. Nerayoff was trying to arrange a relationship with Company 1 so that Company 1's tokens could be used to purchase items at the Overstock web site and become their loyalty program.

[62] **Exhibit 35**: Nerayoff email to Jane Doe and John Doe.

[63] https://coinmarketcap.com/currencies/ethereum/historical-data/

63.     Having put Mr. Nerayoff in a tight spot by not issuing any of the 1.35 billion tokens he owned and was contractually entitled to receive at the conclusion of the crowdsale or to provide him with an estimated 700 million bonus tokens from the loyalty program, John Doe, Jane Doe and Company 1 negotiated harsh terms: Mr. Nerayoff would receive only about 4% of the value of the tokens he legally owned and was entitled to receive via a 'loan' of 10,000 Ether, Mr. Nerayoff would agree to receive only 350 million loyalty tokens and in return Mr. Nerayoff would not sue Company 1 for breach of contract. The harsh terms that Company 1 negotiated resulted in Company 1 making approximately $10 million dollars from Mr. Nerayoff for a transaction that the government has charged Mr. Nerayoff with extortion.

### Mr. Nerayoff, "Peters," John Doe and Jane Doe's trip to Korea

64.     From April 7,2018 to April 13, 2018, Mr. Nerayoff, "Peters," Jane Doe and John Doe travelled to Korea. The purpose of the trip was to promote Company 1 and to forge partnerships such as one with Overstock.[64]

### Company 1 changes the term of the 'loan'

65.     Although the above makes clear that Company 1 provided the 'loan' of 10,000 ETH to Mr. Nerayoff as a way to stave off a breach of contract action and the collateral consequences that would naturally flow from such action, upon the parties return from Korea a false narrative began to take shape.

---

[64] This is just one example of the parties travelling together collaborating for the growth and benefit of Company 1, Mr. Nerayoff, Jane Doe, John Doe and "Peters" also travelled together to California, Israel, New York, all for the purpose of promoting Company 1 and introducing Company 1, Jane Doe and John Doe to the individuals in his crypto network. Discovery provided by the government, of Jane Doe's texts, (See: **Exhibit 36**: Company 1_036138 and **Exhibit 37**: Company 1_036152,) confirm this post alleged extortion conduct in fact occurred and that the parties' relationship was entirely cordial until sometime around May 1, 2018 when Company 1 hired a criminal defense attorney and began recasting their relationship with Nerayoff.

66.     On May 1, 2018, Company 1, which had its headquarters in Seattle, Washington, hired Mark Bartlett a former Western District of Washington federal prosecutor and Seattle based criminal defense attorney.[65]

67.     On May 3, 2018, Company 1's co-founder sent an email to Jane Doe and cc'd John Doe.   Notwithstanding the terms of the ETHER "loan," Company 1's co-founder, was now expecting Mr. Nerayoff to repay the "loan" plus and additional 3,000 ETHER in interest on a two-month loan for an effective interest rate of 180%!

68.     On May 6, 2018, Jane Doe forwarded Company 1 co-founder's email to Mr. Nerayoff—but did not make reference to any interest being due, rather she simply wrote "We need that ETH back sooner rather than later. [Company 1 co-founder] has started campaigning very aggressively about it at work and it's a big issue for us. In fact, quite a few people in our company are asking about it." Incredibly, JANE DOE skipped over the fact that the Company 1 was still holding on to 2.6 billion of Mr. Nerayoff's tokens, 1.35 billion of which should have been released to him 5 months prior.

69.     On May 13, 2018, John Doe and Jane Doe travelled to New York to meet with Mr. Nerayoff. That same day, from 9:41 p.m. to 10:15 p.m. (Eastern Time) Hlady texted with S/A Anderson six times (once again texts which the government first orally said do not exist and then wrote they could not to confirm or deny the existence of said texts as defendant was not entitled to them), called him twice on his cell phone and called the NYC FBI Office once.

70.     On May 14, 2018, from 7:07 a.m. to 11:30 a.m. (Eastern Time), Hlady texted with S/A Anderson 18 times (as noted repeatedly, texts which the government first orally said do not

---

[65] Mr. Bartlett served as a United States Attorney for the Western District of Washington for twenty-five years-his last nine as First Assistant.  Mr. Bartlett chairs his firm's white collar, investigations and government controversies group. https://www.dwt.com/people/b/bartlett-mark-n

exist and then wrote they could not to confirm or deny the existence of said texts as defendant was

not entitled to them), and called S/A Anderson's cell five times and received a call from the NYC

FBI Office.[66]

71.    On May 15, 2018, Jane Doe emailed John Doe and cc'd Michael "Peters." The

subject was "Mike Chat." The email included as chat topics the "theoretical acquisition" of

Company 1 by Alchemist, the 10,000 ETH loan, that "Mike will write about how loan repayment.

Will give in 3 days before Friday," and "Terms of Sale." Even though Jane Doe was in New York

with Mr. Nerayoff she only sent this email to "Peters" and did not discuss any kind of loan

repayment with Mr. Nerayoff.[67]

72.    On May 16, 2018, Jane Doe emailed "Michael Peters" and cc'd John Doe.  The

subject was 10000 ETH Loan 30% Interest (as noted above, 30% interest over 2 months equates

to an annual rate of 180% a rate which is far in excess of those criminalized as usurious in both

New York and Washington State).  In the body of the email, Jane Doe repeated the false claim that

Mr. Nerayoff's "loan" had required him to pay back 13,000 ETHER for what they claimed was in

essence a two-month loan. Jane Doe wrote, "Hi Mike We'd like the plan to receive the 10000 ETH

30% interest back ideally before June 2018 as discussed. Please let us know the plan for repayment

for 13000 ETH. Thanks Warmly [Jane Doe]."

73.    On May 18, 2018, someone other than Mr. Nerayoff recorded a meeting in a hotel

room that he attended with Hlady, John Doe, Jane Doe, Jeff Pulver, Alchemist General Counsel

---

[66] As previously noted, these are only the communications which we have been able to establish based on the telephone records we were able to obtain from the government or obtain through subpoena.

[67] As shown above, the 10,000 Ether was collateralized by 70 million Company 1 tokens and Mr. Nerayoff could simply forfeit the Company 1 tokens in satisfaction of the agreement.

and a third man who worked with Alchemist. The recording of the meeting[68], which had been

called by John Doe in the hotel room to discuss the continued issues relating to Company 1 not

releasing any of Mr. Nerayoff's tokens, started in progress after the parties' had framed the issue,

with Mr. Nerayoff mid-sentence.[69]   Notwithstanding the indisputable video evidence contained in

the three Skype Business Meeting recordings, both Jane Doe and John Doe used this meeting's

recording to falsely recast the parties' negotiations as under duress, allow Hlady to enthusiastically

admit he had threatened Jane Doe and John Doe in March of 2018,[70]  and when Mr. Nerayoff, who

had immediately stated he had not engaged in any threats, was told to shut up by Jane Doe when

he tried to continue to defend himself.[71]

> Nerayoff:         …Coming back and saying, way back when, when we agreed to the
> air drop, that the air drop came, discussion came after the blog post.
> I didn't even know about this blog post by the way. So regardless of
> whether or not I came in before or after, I don't know. And that you[72]

---

[68] **Exhibit 38**: 2018-5-18 Hotel Room recording and **Exhibit 39**: transcript of meeting. Although this transcript was
provided by the government in discovery it has since been revised by a professional transcription service and as such
although it still bears DOJ #s that were affixed by the government it is in essence a new transcript.

[69] Based on a review of Mr. Nerayoff's movements that day and the recording itself it appears that the recording only
reflects a portion of the meeting—that the parties had in fact been discussing Company 1's failure to abide by the
terms of any of its agreements prior to what the recording contains.  It is unclear if the beginning of the discussion
was intentionally edited out or the recording device was only activated after the parties had initially explained their
respective positions.  In either event, it is abundantly clear that the only seconds after the recording begins Jane Doe
accuses Mr. Nerayoff of threatening Jane Doe and John Doe and Hlady enthusiastically admits that he had threatened
them.

[70] One has to wonder why Hlady, who was personally familiar with the criminal justice system, and was then facing
a felony fraud charge in the state of Rhode Island was willing to freely admit conducting that was another felony?
While we can only speculate absent any of the text messages between Hlady and S/A Anderson, given Hlady's
unexplained contact with S/A Anderson, might Hlady's almost gleeful admission of threats be a result of his  received
assurances that he was not going to be prosecuted for these threats?

[71] Although both Jane Doe and John Doe both participated in all three Skype Business Meetings and thus knew that
their allegations against Mr. Nerayoff were false, this staged recording appears to indicate that either they were
unaware that Mr. Nerayoff had recorded the meetings or that they had forgotten that fact (which indeed Mr. Nerayoff
had done until after he was indicted), as the false narrative they  advanced was utterly refuted by the actual recordings
of the parties negotiations.

[72] A reference to Jeff Pulver who had participated in the parties' cordial business discussions which had resulted in a
freely entered into mutually beneficial binding legal agreement in November of 2017, who the government has
apparently identified in the Complaint as co-conspirator 1.

| | |
|---|---|
| | and I threatened to destroy them— |
| Pulver: | When did we threaten to destroy them? |
| Nerayoff: | I, we did not— |
| Pulver:<br>Nerayoff: | I was about to say, I never—<br>I did not recall threatening them to destroy, I recall last time Michael did.[73] |
| Peters: | **Yes, I did.** |
| Nerayoff: | Michael did say that last time, yes. |
| Peters: | **Absolutely.** |
| Nerayoff: | And last, and last time I don't disagree about that— |
| Peters: | **Absolutely.** |
| Nerayoff: | But back then, Jeff and I did not. |
| Pulver: | I don't have that in my vocabulary. |
| Peters: | **No we did absolutely, no, no, no, no, no, no I don't know what happened before I was involved, but I've tell you---** |

74.     In response to these denials of threats by Mr. Nerayoff and Pulver, Jane Doe replied "But I, I feel like you guys are--ganging up on us and pressuring us, we're in a hotel room, sitting here."   After Mr. Nerayoff's General Counsel framed the issue as really not about the past but about where the parties stood at that moment, and whether they could find some middle ground in their dispute, and whether Mr. Nerayoff was going to sue Jane Doe or Jane Doe or Jane Doe, John Doe and Company 1 were going to go abide by the terms of the November 7, 2017 contract, Jane

---

[73] A reference to the March 28, 2018 text that Peters/Hlady had sent to Jane Doe on his own initiative.

Doe repeated that she felt "very uncomfortable," and "ganged up on right now," Pulver suggested that they meet "in a restaurant or some place so it feels more comfortable that's fine."[74]

75.     When Mr. Nerayoff began to explain his position that "while his proposed merger was going to be the best thing that ever happened to [Company 1]" but that he could do what he wanted to do with or without Company 1, Jane Doe replied "So, you're threatening us again right now?" When Mr. Nerayoff began to respond "No, I'm saying--," Jane Doe cut him off "Okay, so then please stop talking!" When Mr. Nerayoff again attempted to explain his position, "No, I'm not threatening," Jane Doe again replied "Please stop talking." When Mr. Nerayoff again began to speak, "I'm saying, I'm doing this to benefit all of us," Jane Doe replied yet again "Please stop talking, Can we get our facts together?" When Mr. Nerayoff replied "I have them right here in an e-mail, text message back and forth between me and you--Jane Doe simply replied "No." When Mr. Nerayoff stated "There's been three agreements. One agreement we hired [Jane Doe] to work for us," she replied "No there's no agreement."

76.     John Doe interjected shortly after "Steve, but we, we do need Ether, that, that's something that we just can't live without at the moment." Mr. Nerayoff responded" Well you can sell my [Company 1] tokens. The, the, that I left as collateral." John Doe laughed nervously "We cannot." When Mr. Nerayoff asked "why," John Doe simply replied "We cannot. That's--" At which point Mr. Nerayoff asked him "Did, did you know that we had this conversation are you aware of this? Are you aware of everything that happened?" John Doe replied "So, so you are saying that the Ether will not be given back to us?"

---

[74] Of course, a restaurant would have not only not allowed Jane Doe and John Doe to say they felt intimidated in a tiny hotel room, a meeting place that they choose, it also would have made an audio recording much more difficult based on likely background noise—which is likely why John Doe suggested that meet in the room in the first place.

77.     At this point Mr. Nerayoff asked "So you're saying that the agreement, as that we had is not valid? I'm just, I wanna know, I'm just [UI] I want to know at what point is an agreement valid with you two? Because the one point three five wasn't valid[75], now the three fifty[76] isn't valid. At what point do you guys, say okay, this one we're gonna honor? Is it [UI] I'm just curious when does your word, when is your word good? And this is in writing." Jane Doe replied, contrary to the indisputable video of the parties' agreement in November (and other evidence submitted with this motion), "When one is not being threatened," and falsely stated that the November 7, 2017 agreement was the product of coercion and not freely entered into. The video recording, however, speaks for itself.

78.     Less than a minute later, "Peters" suggested that Jane Doe and John Doe leave and that "Peters" speak with Mr. Nerayoff before the parties met downstairs in the lobby. The recording provided by the government ended shortly after it appears Jane Doe and John Doe left the room.

**Hlady's Continued Contact with Jane Doe, Agent Anderson**

79.     As noted *above*, telephone billing records for the period June 2018 through November 2018 show that Hlady, Jane Doe and S/A Anderson were in contact around the times that Jane Doe was recording Hlady in attempts to obtain incriminating statements against Hlady and Mr. Nerayoff.[77]  We believe that the only inference that can be drawn from these contacts, and

---

[75] A reference to the 1.35 billion tokens that Company 1 was contractually required to release to Mr. Nerayoff on December 7, 2017.

[76] A reference to the 350 million loyalty program tokens (rather than the 700 million he was entitled to) that Company 1 agreed to give him when they extracted this concession that has part of the Ether transaction.

[77] The recorded calls described in this section are contained in the following exhibits. Although these transcripts were also provided by the government in discovery it has since been revised by a professional transcription service and as such although they still bears DOJ #s that were affixed by the government they are in essence new transcripts: **Exhibit 40** recording of June 21, 2019 call (DOJ—5927) and **Exhibit 41**: Transcript of same call; **Exhibit 42:** recording of June 21, 2018 call (DOJ—5929) **and Exhibit 43**: Transcript of same call; **Exhibit 44**: recording of June 22, 2018 call (DOJ-5930) and **Exhibit 45**: transcript of same call; **Exhibit 46:** recording of November 19, 2018 call (DOJ-0028) and **Exhibit 47**: transcript of same call; **Exhibit 48**: recording of November 21, 2018 call (DOJ-005932) and **Exhibit**

the contents of the calls described below, particularly in light of the 100 text messages between Hlady and S/A Anderson (texts which the government first orally said do not exist and then wrote "we're not going to confirm whether any such texts or emails exist given the that any request for information far exceeds the government's Rule 16 obligations") , and their unexplained extensive telephone contact, is that the calls were in fact scripted and staged to incriminate Mr. Nerayoff in activities which did not occur and to set the basis for the government's eventual charges of extortion. To date, the government has failed to produce a single note, or 302, created by S/A Anderson concerning his contacts with Hlady other than two 302s that dealt with information that Hlady provided after he was brought in for questioning in February and March of 2019. Indeed, the government claims that if any such records do exist that Mr. Nerayoff is not entitled to them.

80.    Notwithstanding the fact that Hlady was merely an employee of a company hired by Mr. Nerayoff, who was only retained as a consultant, on June 1, 2018, Hlady entered into a non-disclosure agreement with Company 1, on behalf of Mr. Nerayoff's company Alchemist, as Michael Peters with a title of Chief of Staff. Curiously, Hlady never told Mr. Nerayoff about this agreement. On June 7 and June 8, 2018, Hlady travelled alone to Seattle and met with Jane Doe and John Doe.[78]

81.    On June 20, 2018, Jane Doe, called Hlady at 8:45 a.m. and 2:50 p.m. and received a call back from Hlady at 2:51 p.m.[79] At 4:35 p.m., Jane Doe received an 8 second call from the

---

**49:** transcript of same call; **Exhibit 50:** recording of November 21, 2018 call (DOJ-5934) and **Exhibit 51**: transcript of same call; **Exhibit 52**: recording of November 21, 2018 call (DOJ-5935) and **Exhibit 53:** recording of same call.

[78] This was confirmed in recordings provided by the government in which Jane Doe and Hlady discuss his trips to Seattle where the headquarters for Company 1 are located.

[79] Each of these calls were of very short duration: 4 to 5 seconds.

Seattle Office of the FBI—the next day *June 21, 2018,* Agents from the Seattle Office met with Jane Doe and recorded several telephone conversations she had with Hlady.[80]

82.     On June 21, 2018, at 4:31 pm Jane Doe called Hlady and spoke for 2 min 31 seconds—she chose to block her number when making this call. Hlady and Jane Doe discussed Company 1's acquisition [by Alchemist], Jane Doe telling Hlady that it didn't make sense for Company 1.  Hlady told Jane Doe that they should try to have it make sense and told her he would call her back in half an hour.

83.     On June 21, 2018 at 5:18 pm Hlady called Jane Doe back and they spoke for 5 min and 31 seconds. During this call, Hlady told Jane Doe in sum and substance that he would make everything ok, that she would be fine, that he wanted to make her happy and that he would work it out for her.  During this call Jane Doe asked Hlady about the return of the 13,000 ETH and Hlady promised to get Mr. Nerayoff to return the Ether and not seek to acquire Company 1.  After Jane Doe pointed out that Hlady's demeanor had been different when he had visited her in Seattle, Hlady stated "let me get him so that it is right for you guys."  Hlady also told her that he was no longer going to be with Alchemist.[81]

84.     On June 22, 2018, Agents from the Seattle Office FBI recorded a series of phone calls between Jane Doe and Hlady. At 7:13 a.m., they spoke for a total of 2 minutes and 48 seconds. During this call, Hlady continued his conciliatory tone from the day before, telling Jane Doe "don't worry," that he would advise Mr. Nerayoff to give back the [Ether], "…you know, you still have

---

[80] Each of the referenced recordings were provided by the government in discovery.

[81] I believe that this call is significant as it not only reinforces the false Ether loan returned with 180% interest narrative, that Jane Doe and Hlady first created in May of 2018, it also includes Jane Doe telling Hlady that Mr. Nerayoff, not Hlady made her anxious, which is in direct conflict with the government's theory that Hlady was  a "tough guy" that Mr. Nerayoff hired to intimidate Jane Doe, John Doe and Company 1.

a bajillion tokens[82]; and just let them—leave them on their own." I'm trying to fulfill your wishes. "You've got to trust me that you won't be destroyed.[83]"

85.     On July 17, 2018, Hlady placed a 27 second call to S/A Anderson's Cell Phone and later that day received a call from the main line at the FBI NY Office which lasted 280 seconds.

86.     From July 23 through August 15, Hlady took four trips to Seattle, all without the knowledge of Mr. Nerayoff, and all in order to meet with Jane Doe and/or John Doe.[84]

87.     On the morning of September 24, 2018, Jane Doe, who was then a few months pregnant, was fired by Company 1.[85]   On the same day, at 12:00 pm, the FBI NY Office called Jane Doe.  The call lasted 42 seconds.

88.     On September 25, 2018, at 11:43 a.m., Jane Doe called S/A Anderson's direct line at the NY Office of the FBI. The call lasted 39 seconds. At 3:09 p.m. Jane Doe called S/A Anderson's direct line at FBI. The call lasted 41 seconds.

89.     On September 26, 2018, at 7:48 a.m. The NY FBI called Jane Doe. The call lasted 43 min and 24 seconds. At 8:34 a.m. The NY FBI called Jane Doe. The call lasted 9 min and 56 seconds.

---

[82] Of course, as noted above Mr. Nerayoff had received ZERO Company 1 tokens—the whole point of the Ether 'loan' was to provide him with some value for the Company 1 tokens they refused to release to Mr. Nerayoff.

[83] Again, as noted above, how exactly would Company 1 be destroyed?  Would it be because of adverse publicity generated by a lawsuit that would establish that Company 1, Jane Doe and John Doe had defrauded Mr. Nerayoff and the public?

[84] We know from discovery provided by the government that Hlady also travelled to Seattle on July 23 to July 24, on August 6 to August 7, and on August 14 to August 15. Prior to the August 14 trip, on August 12, 2018, Hlady called Jane Doe. The call lasted 19 seconds. We believe that Hlady took all these trips to Seattle to meet with Jane Doe. It is unclear if Agents from the Seattle Office of the FBI covered these meetings or if they were recorded as we have not received any information relating to these trips from the government in discovery—although in a 302 report of an interview with Hlady that the government did provide in discovery, Hlady claimed that on a trip to Seattle he met with John Doe and Jane Doe and offered to assist them in the recovery of the 10,000 Ether in return for $500,000.

[85] The fact that Jane Doe was fired by Company 1 is confirmed by Jane Doe in some of the recorded calls made by the FBI.

90.    On September 27, 2018, at 1:07 pm The NY FBI called Jane Doe. The call lasted 41 seconds.  Later at 4:32 p.m., Jane Doe called Seattle attorney Harold Malkin[86] on his cell phone, the call lasted 16 minutes and 33 second.

91.    Also on September 27, 2018, the NY FBI subpoenaed telephone billing records for *both* Hlady and Jane Doe 1's cell phones for the period January 1, 2016 through that date.  We do not believe that the FBI subpoenaed both Jane Doe's the alleged victim and Hlady the alleged extortioner's telephones on the exact same day, for the exact same period of time, by coincidence.

92.    On September 29, 2018, at 2:57 p.m., Hlady called Jane Doe. The call lasted 3 seconds. On October 5, 2018, at 7:09 a.m. Jane Doe called Hlady. The call lasted 5 minutes and 3 seconds.  On November 8, 2018, at 3:41 p.m. Hlady called Jane Doe. The call lasted 3 seconds.[87]

**Mr. Nerayoff's contact with Jane Doe after discovering "Peters" was Hlady**

93.    On November 17, 2018, at 4:51 p.m., Mr. Nerayoff called Jane Doe and left a message. This was eight days after Mr. Nerayoff had learned that decorated former federal agent and consultant "Michael Peters" was actually a convicted felon/con man Michael Hlady and severed all ties with him.[88]

94.    On November 18, 2018, at 2:59 p.m., 4:23 p.m. and 4:24 p.m. Hlady texted with S/A Anderson (once again, the contents of this text message are unknown as the government claims

---

[86] According to his firm's biography, Harold Malkin is a former Assistant United States Attorney for the Western District of Washington who "focuses on guiding individuals and companies through civil and criminal government investigations and prosecutions" (https://www.morganlewis.com/bios/haroldmalkin). Jane Doe did not have an attorney present when she made the June 20, 2018 recordings with the FBI we believe that Malkin was hired sometime after Jane Doe was fired by Company 1 on September 24, 2018.

[87] On September 30, 2018, Bartlett's firm billed Company 1 for "New York FBI Meeting," previously the firm had billed Company for "Alchemist Inc. Matters."

[88] Although Mr. Nerayoff believes he left a voice message on Jane Doe's phone this recording has not been provided to him in discovery.

that Mr. Nerayoff is not even entitled to know whether these texts exist or not). On November 19, 2018, at 6:23 a.m. Hlady texted S/A Anderson and at 6:23 a.m. Hlady received a 5-minute call from the NY FBI Office.

95.    That same day November 19, 2018, at 7:39 a.m., a little over an hour after speaking with S/A Anderson, Hlady called Jane Doe.  The call lasted 6 seconds and was not apparently monitored by Agents of the Seattle FBI Office.  At 2:05 p.m. and 2:49 p.m. Hlady texted Jane Doe. Later that day Agents from the Seattle Office and Harold Malkin, Jane Doe's criminal defense attorney, were with her as she recorded several telephone conversations.[89]

96.    On November 19, 2018, at 3:58 p.m., Jane Doe called Mr. Nerayoff's in a call that was record by FBI Agents from the Seattle Field Office that Mr. Nerayoff also recorded. The call lasted 56 min and 4 seconds.  Mr. Nerayoff, who hadn't spoken with Jane Doe for a while, first asked how Jane Doe was and congratulated her when he found out that she said she was pregnant. In addition, Mr. Nerayoff informed Jane Doe that he was actually calling, as the recording reveals, to inform Jane Doe that "Michael was a "two bit con artist," and cautioned Jane Doe that "what I'm about to tell you is going to sound really freaking weird..," "kind of like a spy novel.." and "I want to explain to you what happened and then I need you to help me fill in some of the blanks," "about the merger."

97.    Mr. Nerayoff, as the recording confirms was attempting to find out the extent of Hlady's con, asking Jane Doe "what happened… [after] Michael started talking to you guys…the last five months, Michael has been telling me um that everything is going great, you guys are really happy. Everything is, you know, moving along…but I found out everything is not true. I got rid of

---

[89] Unlike the calls in June, prior to her being terminated from Company 1, Jane Doe now has a Criminal Defense Attorney present when recording calls with the FBI.

him, I was hiring this company, and he wasn't actually an employee…, I think he was a con-artist, basically."

98.     During the recording, Mr. Nerayoff can be heard attempting to learn what Hlady had actually done in his connections with Company 1, if John Doe was working towards a merger of Company 1 with someone other than Mr. Nerayoff, and advising Jane Doe "do not trust anything [Hlady] says," rebutting several false statements that Jane Doe made in an apparent attempt to reinforce the false claims that Jane Doe, John Doe and Company 1 had made since the parties returned from Korea and Company 1 hired a criminal defense attorney.[90]  The call concludes with Mr. Nerayoff asking "You think, [John Doe's] taken the position that I am not getting those tokens…He doesn't believe I'm entitled to the 2.25…let me call [John Doe] I will call you back.[91]"

99.     A few minutes after her all with Mr. Nerayoff ended, Jane Doe called Hlady and left a voice message asking for a call back.

100.    On November 20, 2018, at 4:27 a.m. Hlady texted with S/A Anderson twice (once again, the contents of these text messages are unknown as the government has taken the position that Mr. Nerayoff is not entitled to know if they even exist). At 4:50 a.m. and 4:51 a.m. Hlady again texted with S/A Anderson.  At 7:24 a.m. Hlady called the NY FBI Office. The call lasted 1 minute. At 7:25 a.m. Hlady called S/A Anderson's cell. The call lasted 1 minute. At 7:26 a.m. Hlady called the NY FBI Office. The call lasted 1 minute. At 7:28 a.m. Hlady received a two-

---

[90]  The false statements by Jane Doe included:  that Michael [Peters/Hlady] was not Alchemist's President, Mr. Nerayoff had been "pissed" at Jane Doe and the two had to be separated at the May 18, 2018 Hotel Room Meeting, that Company 1 had never agreed to the November 7, 2017 Agreement, or promising to send Mr. Nerayoff any loyalty program tokens, misrepresenting the terms of the parties November 7, 2017 agreement—which were abundantly clear when the parties reached the agreement via Skype Business Meeting— and telling Mr. Nerayoff that the only way he could fix the issue was by ripping up the parties November 7 agreement, and returning the 10,000 Ether and go back to the parties original July 2017 agreement which had been voided because of the parties mutual misunderstanding.

[91] Mr. Nerayoff was however unable to reach John Doe despite numerous efforts.

minute call from the NY FBI Office. The next day, November 21, 2018, Agents from the Seattle Office met with Jane Doe, and her criminal defense attorney, and recorded several telephone conversations she had with Hlady.

101.    On November 21, 2018, after Hlady's numerous contacts with both S/A Anderson and Jane Doe over the previous 3 days, Jane Doe placed a series of calls to Hlady that were recorded by Agents from the Seattle Office of the FBI.  Based on this level of activity, we firmly believe that Hlady was aware that the calls were being recorded and that these calls were staged and scripted—even Jane Doe's attorney Harold Malkin was present during these calls can be heard in the background on an inadvertently captured in room conversation between Malkin and Jane Doe "he's [Hlady] probably got FBI agents with him, recording you, at the moment."[92]   In one recording Mr. Hlady gratuitously tells Jane Doe that one of his former "teammates" had been shot in the head and killed.  Even though Jane Doe had been alerted by Mr. Nerayoff by then that Hlady was a con-artist, this gratuitous statement by Hlady injected into the conversation an element of "danger" which the government used in its complaint to bolster the extortion charges, charges which the undisputed evidence establishes were utterly false.

102.    On the morning of November 29, 2018, Hlady and S/A Anderson texted back and forth a total of 11 times (once again, texts which the government maintains that Mr. Nerayoff is not even entitled to know if they exist or not).  The next morning, November 30, 2018, Hlady and S/A Anderson texted an additional 10 times and Hlady received a two-minute call from the mainline at the NY FBI at 12:53 p.m.

---

[92] While the recording provided by the government in discovery (DOJ-000005933) made what Malkin said difficult to hear, this comment and the remainder of the small talk captured in-room, is extremely clear after the recording was enhanced by an independent transcription service.  Exactly why Mr. Malkin thought FBI agents would be with Hlady recording his call with Jane Doe is unclear, as Mr. Malkin refused to discuss the details of the recording when I contacted him in an attempt to interview Jane Doe. Suffice to say, we believe that Malkin's comment may be related to activity that Jane Doe engaged in with Hlady that caused her to be fired from Company 1.

103.    On February 6, 2019, Hlady used his cell phone to text the main line at the NY FBI office four times and placed a call to S/A Anderson's cell phone and a call to the main line at the NY FBI office. The next day, On February 7, 2019, Hlady texted S/A Anderson's cell phone five times and received one text from Anderson's cell phone.   On February 11, 2019 Hlady texted S/A Anderson's cell phone and received a text back from S/A Anderson's cell phone (of course, the government maintains that Mr. Nerayoff is not entitled to know if these texts exist at all, as they further maintain that he would not be entitled to them).

104.    On February 12, 2019, Hlady's cell phone received a call from S/A Anderson's cell phone.  Sometime on February 12, 2019, Hlady met with S/A Anderson and AUSA Mark Bini. While it was unclear what brough Hlady to meet with them, a copy of S/A Anderson's 302 report, obtained from the government in discovery, reveals that S/A Anderson has brought Hlady in to elicit information about Mr. Nerayoff, and that Hlady was gladly complying.   At one point however, t Hlady was shown a copy of his March 28, 2018 text to Jane Doe, after which he asked "Did [Jane Doe] say this was me" and told S/A Anderson that he wanted a lawyer. The final line of S/A Anderson's 302 report reads "Hlady stated multiple times 'I'm not going down for this [expletive] guy.'"

105.    On February 15, 2019, Hlady's cell texted S/A Andersons' cell phone and received a call from the main line at the NY FBI Office.  On February 18, 2019, Hlady's cell phone texted S/A Anderson's cell phone twice.

106.    On March 5, 2019, Hlady again met with S/A Anderson and AUSA Mark Bini. Also present at this meeting was Hlady's criminal defense attorney, the same two SEC enforcement attorneys who had met with Mr. Nerayoff on February 27, 2018 and another SEC employee. During this meeting, Hlady, in addition to falsely implicating Mr. Nerayoff in the non-existent

Company 1 extortion scheme and suggesting other areas that the government should investigate Mr. Nerayoff – including a discussion of the tZERO deal that, as described *above*, Jonathan Lucas and Mr. Nerayoff had worked on and had apparently been of interest to the SEC at Mr. Nerayoff's February 27, 2018 interview – also revealed that Mr. Nerayoff had fired him after learning of his true identity and criminal history and for not actually working towards Alchemist's acquisition of Company 1, and that during one of the trips that the he took to Seattle behind Mr. Nerayoff's back, Jane Doe and John Doe had offered Hlady $500,000 if he could convince Mr. Nerayoff to return the 10,000 Ether "loan."[93]

### **Mr. Nerayoff's transmission of information to FBI re Hlady and the FBI's failure to act**

107. On December 14, 2018, Mr. Nerayoff emailed S/A Jordan Anderson informing him "I would like to speak with you on several topics." S/A Anderson did not reply.

108. On March 22, 2019, Jack Lynch, Alchemist's COO, spoke with S/A Amanda Brenner in the FBI's Newark Field Office regarding Hlady's con of Mr. Nerayoff and Alchemist. On March 27, 2019, S/A Brenner emailed Lynch that she would be referring the matter to the New York FBI Office. On April 13, 2019 Lynch received a telephone call from an agent (#9160) with the Long Island Office of the FBI concerning Lynch's complaint regarding Hlady. The conversation, which the agent said was recorded, lasted twenty minutes.[94]

---

[93] Of course, the 100 text messages between Hlady and S/A Anderson—that the government orally disclosed do not exist and then wrote they would neither confirm nor deny their existence-- would no doubt reveal the true nature of their relationship, absent those text messages or any other recorded information regarding Hlady's contact with S/A Anderson we have no way of knowing if this second Hlady interview, in which he allegedly provided incriminating information against Mr. Nerayoff, was a byproduct of this relationship with S/A Anderson.

[94] The government has not provided us with a copy of this recording or even a 302 of the conversation.

109.   On May 2, 2019 Lynch emailed Agent Anderson a financial statement detailing hundreds of thousands of dollars in payments made to Hlady and his accomplices.  Later that same day, Lynch in an attempt to get a response from Anderson, emailed Anderson:

> "I was speaking with Steven about the conversations you had last year regarding Jonathan Lucas. There apparently have been some significant updates that has had Steve quite concerned and he would like to have a follow up conversation with you. Would you be available for such a call."

Despite this request and a subsequent request by Mr. Nerayoff's attorneys to speak with S/A Anderson or AUSA Mark Bini, neither would speak with Mr. Nerayoff until after they had arrested him.  The next time S/A Anderson spoke to Mr. Nerayoff was on September 19, 2019, when he stormed into Mr. Nerayoff's residence with a team of FBI agents and arrested him.

110.   On May 16, 2019, Lynch, frustrated for lack of action on behalf of the FBI and having not heard back from S/A Anderson emailed Anderson asking to "follow up with you regarding Michael Hlady/Peters…"

> "Everybody that I discuss the situation with feels like it's obvious that a crime occurred with yet another fraud from a multiple time convicted felon. He's actually currently out on probation I believe, at least until next month. I'm somewhat frustrated that so much time has passed here. What could we be doing to get this matter Accelerated in the priority list? I've always assumed this was an obvious federal matter due to the multi state jurisdiction. Would you prefer we address this with state authorities in the hope that they can move faster? Apologies if the tone of this message comes across poorly.  This company was greatly harmed by the actions of the individuals I emailed you about previously."

111.   On May 28, 2019 Lynch emailed an Assistant Attorney General at the NY State Attorney General's Office with a copy of a fifty-six page dossier that Mr. Nerayoff had assembled about Hlady's con. The introduction of the dossier read:

> What if I were to tell you a convicted felon and career con man pretending to be a United States Government Agent on a break from his CIA, NSA & Blackwater assignments was able to defraud an emerging New York technology company out of nearly $1 million in cash and millions of dollars more in wasted time, effort & opportunity? And what if I told you, perpetrating this fraud required the active

43

participation of this felons' girlfriend, as well as Rhode Island business leaders, including a former Speaker of the Rhode Island House of Representatives, who knew full well of the felons criminal past since he was actively representing him on an outstanding felony charge, while the fraud was taking place. You'd probably say such a thing could never happen, but it could, and did. This is the story of Michael Peters (in reality convicted felon Michael Hlady) and his accomplices.

112.    The dossier went on to detail how Hlady, as part of his con to seem credible, had even insinuated himself into a highly publicized Alchemist-Rhode Island Blockchain Event jointly hosted with Gina Raimondo then Rhode Island Governor--and since March 3, 2021, United States Secretary of Commerce.  Hlady, who recently was released for conning nuns and was presently facing felony fraud charges in Rhode Island served as the MC for the event.  Hlady even sat at the table during a lunch Mr. Nerayoff was having with United State Senator Sheldon Whitehouse.  We are unaware whether the FBI relayed the information Mr. Nerayoff provided to them and informed Secretary Raimondo or Senator Whitehouse that a convicted felon who was then facing felony charges in Rhode Island infiltrated their inner circle.

113.    On June 17, 2019, Lynch again emailed with Agent Anderson to set up a meeting for Lynch to discuss the dossier and on June 20, 2019, Lynch emailed a copy of the dossier to S/A Anderson.  S/A Anderson, however, refused to allow Mr. Nerayoff to participate in the call with Lynch and Bini and would not speak with him otherwise.  On July 30, 2019, an attorney at the law firm that Mr. Nerayoff had hired to draft a complaint against Company 1 for, inter alia, breach of contract in connection with the services Mr. Nerayoff provided to Company 1, called former Assistant United States Attorney Mark Bini to discuss the dossier but was also unsuccessful in making contact with him.

114.    Notwithstanding Mr. Nerayoff's complaint that he had been conned by Hlady, the government not only refused to speak with Mr. Nerayoff, they took no action against Hlady for

this con, rather the government cast Hlady as Mr. Nerayoff's co-conspirator in a made up extortion scheme knowing full well that Mr. Nerayoff was a victim of both Company 1 and Hlady.

### The February 2, 2019 Subpoena for Mr. Nerayoff's Apple account

115.     On February 2, 2019, the FBI NY Office requested information on Mr. Nerayoff's Apple Account in connection with Agency Case Number: 19-MC-264; 2018R00035.   Mr. Nerayoff received notice of this request on March 17, 2020, when Apple emailed him of the request.[95]

### False Statements in the September 17, 2019 Affidavit by S/A Anderson in support of the Arrest Warrant[96]

116.     On September 17, 2019, S/A Anderson swore, under the penalty of perjury, to the Complaint which resulted in Magistrate Judge Ramon E. Reyes, Jr of this court issuing a warrant for the arrests of Mr. Nerayoff and Hlady ("Anderson Affidavit").

117.     While to be sure, an affidavit in support of an arrest warrant need not include all information about a parties' relationship with an alleged victim, the Anderson Affidavit (like the subsequent grand jury presentation which resulted in the indictment) was *materially false*[97] and S/A Anderson knew that his statements were false.   Whomever provided S/A Anderson with the

---

[95] Mr. Nerayoff backed up data—including the Skype videos described above--at his Apple i-cloud. Although the FBI appears to have obtained information from Apple regarding his account Mr. Nerayoff has never received an inventory of that information the FBI obtained from Apple in connection with the February 2, 2019 request.  As noted below, on January 23, 2023, Mr. Nerayoff's counsel made a request to the government pursuant to  Fed.R.Crim. Pro. §16 demanding "[t]o inspect and to copy, photograph, etc. any of Mr. Nerayoff's papers, documents, data, photographs, tangible objects, in the government's possession, custody, or control obtained from Mr. Nerayoff or previously under his control—including but not limited to the digital information the Government received from Apple Inc. that resided on Mr. Nerayoff's Apple i-cloud backup.  We would also request an inventory of these items."

[96] These facts are also offered as in conjunction with the allegations in the indictment, as we believe that together they provide a "road map" of the government's case and the likely information that the government presented to the grand jury to obtain the indictment—information that we believe we have proven is materially false.

[97] While to be sure there are true statements in S/A Anderson's affidavit, those statements are ones that don't falsely implicate Mr. Nerayoff in connection with any wrongdoing whatsoever.

information upon which it was based provided intentionally false information.  Further, much of the information that establishes Mr. Nerayoff's actual innocence of the charges contained in the Complaint and Indictment *were in the possession of the government as early as February 2019 –* a full seven months prior to Mr. Nerayoff's arrest – when Company 1 created the pdfs of emails and texts with Mr. Nerayoff and provided them to the government.

118.    In particular, S/A Anderson swore under oath, "The defendant MICHAEL HLADY, also known as, "Michael Peters," was a resident of Hicksville, New York. In or about and between the end of 2017 and November 2018, both dates being approximate and inclusive, HLADY was hired by the defendant STEVEN NERAYOFF to be a consultant to Alchemist, and to perform functions similar to a Chief Operations Officer. HLADY used the alias "Michael Peters.[98]"

119.    Anderson however, as noted above, knew that Mr. Nerayoff had signed a consulting agreement with an entity that "Peters" said was a legitimate consulting company staffed by former government agency types in mid-January 2018 after the conclusion of the Company 1 crowdsale, and that Hlady had conned Mr. Nerayoff into paying the consulting company hundreds of thousands of dollars for doing nothing while we believe  he was acting as an informant for the government. S/A Anderson was well aware of this fact as it was included in the dossier sent to him 4 months earlier in June 2019.

120.    S/A Anderson also swore that "[a]fter MV and Company 1 signed the [July 22, 2017] agreement, the defendants STEVEN NERAYOFF and MICHAEL HLADY took various

---

[98] Exhibit 3: Complaint at: at ¶ 4.

actions to threaten John Doe, Jane Doe and Company 1 in order to extract additional compensation without promising or rendering any additional services, as detailed below.[99]"

121. That the parties mutually agreed on September 10, 2017, that the contract had to be renegotiated was known to the government as Jane Doe's email, of September 10, 2017, to Mr. Nerayoff and described herein above was included in documents that the government obtained sometime in February of 2019 — seven months prior to S/A Anderson's swearing, under the penalty of perjury, the truth of the Complaint.  It is unclear at this time if the government obtained the Skype Business Meeting recordings when they served Apple, Inc. for Mr. Nerayoff's account information, but since June 21, 2022, the government has been in possession of multiple video recordings that clearly show that the continued negotiations between the parties was the result of a mutual misunderstanding and not extortion.[100] Moreover, the recordings also show that all of the negotiations were cordial and friendly and at no time did Mr. Nerayoff, or his associates, ever threaten anyone.

122. S/A Anderson also swore that "[o]n or about and between October 30, 2017 and November 6, 2017, the defendant STEVEN NERAYOFF and a co-conspirator ("Co-Conspirator

---

[99] Ibid at ¶ 14.

[100] At no time over time since then has the government disputed the accuracy and authenticity of these recordings. While we do not know if the government has attempted to contact Jane Doe and/or John Doe to discuss the stark differences in what actually happened as opposed to what the government alleged in bringing this prosecution, my attempts at interviewing John Doe and Jane Doe through their counsel were rebuffed.

On August 15, 2022, upon his request I emailed Mark Bartlett, Company 1's attorney the areas I was interested in speaking with John Doe about:

"1) Why was [Jane Doe] terminated from [Company 1]?
2) Was [Jane Doe] working with Hlady?
3) Was [John Doe] aware that Hlady claims [Jane Doe] offered him $500,000 for the return of the "10,000 ETHER Loan?"
4) Did [Jane Doe] ever tell [John Doe] that Hlady had threatened her at Steve's home in March of 2018?
5) Did [Company 1] report the alleged extortion to the FBI or did the FBI come to [Company 1]]? Did the FBI come in with a "prepacked case" as [John Doe] allegedly told a third party? Which FBI agent did [John Doe] deal with.
6) How much does [Company 1] claim that Steve is entitled to for his role in the ICO?"

1[101]") contacted John Doe and Jane Doe and demanded that Company 1 agree to let MV keep 30,000 ETH (worth approximately $8.75 million on November 7, 2017) that it had been holding from the pre-sales. NERAYOFF stated, in sum and substance, that if John Doe and Jane Doe did not agree, then NERAYOFF would, among other things, sabotage the crowdsale, generate negative press for Company 1 and use his contacts with influential people to "destroy" Company 1. NERAYOFF told John Doe, in sum and substance, that John Doe had a choice: NERAYOFF could keep all the pre-sale funds raised and destroy Company 1, or Company 1 could sign two agreements that he sent.[102]

123.    This too was another absolute lie, as we know from the video recordings of the actual negotiations conducted over Skype Business and the emails leading up to it detailed herein above, emails which were in the possession of the government at least seven months prior to S/A Anderson's sworn complaint. Indeed, while the complaint accused Mr. Nerayoff of threatening to "sabotage the crowdsale, generate negative press for Company 1 and use his influential people to 'destroy' Company 1," Mr. Nerayoff did no such thing. To date, the government has failed to provide in discovery a single threat by Mr. Nerayoff against Jane Doe, John Doe and Company 1, because no such thing exists. Indeed, the actual facts are the opposite as Mr. Nerayoff had consistently sought to aid Company 1 in a successful crowdsale.[103]

124.    In addition, S/A Anderson also swore "[a]t the conclusion of Company 1's crowdsale, 1.3 billion of Company 1's tokens still remained unsold. On approximately December 1, 2017, Company 1 incentivized users of Company 1 tokens and participants in the crowdsale to

---

[101] A reference to Jeff Pulver, who we submit, like Mr. Nerayoff, only conspired to commit lawful business activities.

[102] Ibid at ¶ 17.

[103] See Exhibit 17, November 6, 2017 Skype Meeting Video and Exhibit 18 transcript thereof.

retain the Company 1 tokens by promising to distribute any unsold tokens to them.  Despite not being eligible to receive these tokens, between approximately December 2017 and May 2018, the defendant STEVEN NERAYOFF demanded 1 billion of the unsold tokens from Company 1, before revising his demand to 350 million tokens."[104]

125.    This too was another lie. In fact, the government had in its possession, since at least February 2019, the text messages that not only prove Mr. Nerayoff did not demand 1 billion tokens but had the text messages in which Jane & John Doe wouldn't allow all of Mr. Nerayoff's tokens to be included in the Loyalty Program like every other token holder.  The irony is that it was Mr. Nerayoff who was disadvantaged and not treated like every other token holder due to John & Jane Doe's refusal to do so and the government had these messages in their possession.

126.    Furthermore, S/A Anderson also swore under oath, "[i]n approximately March 2018, the defendant STEVEN NERAYOFF demanded that Company 1 give him a purported loan for 10,000 ETH (valued at approximately $4.45 million on March 28, 2018). Around that same time, NERAYOFF introduced the defendant MICHAEL HLADY to John Doe and Jane Doe. NERAYOFF stated, in sum and substance, that HLADY was his "operations guy," whom they should view as the president of Alchemist. NERAYOFF also told John Doe and Jane Doe that HLADY was a former government agent who could carry firearms through airports. On separate occasions, HLADY told Jane Doe, in sum and substance, and among other things, that he had been shot at and had killed people, that he had "taken down" a head of state, and that he had been a part of the Irish Republican Army, the National Security Agency, the Central Intelligence Agency and

---

[104] Ibid at ¶ 22.

the Federal Bureau of Investigation.  The email address from which HLADY would email John Doe and Jane Doe had an Alchemist domain.[105]"

127.    Again, as detailed herein above, Mr. Nerayoff did not demand a loan from Company 1, John Doe and Jane Doe offered to 'loan' Mr. Nerayoff the 10,000 ETH as a way to provide him with some value for the 2.25 billion tokens (plus his percentage of loyalty tokens), that he was then entitled to, which Company 1 was holding hostage in Company 1's public wallet while never disclosed that they belonged to anyone other than Company 1.  With regard to the statements that "Peters" made to Jane Doe about being shot at and killing people in government service, these statements appear consistent with Hlady's con, which S/A Anderson knew about. The only discussion involving people being killed occurred, as noted above, was when "Peters" in the *staged* November 21, 2018 recorded call with Jane Doe (made after he spoke with someone at the NY FBI Office), he awkwardly started the conversation off by saying one of his teammates had been killed.[106] This "threat" was made by Hlady after everyone, Jane Doe, the FBI and even Mr. Nerayoff, knew that Hlady was a total fraud

128.    S/A Anderson also swore under oath that, "[b]etween March 20, 2018 and March 23, 2018, both dates being approximate and inclusive, Jane Doe visited the defendants STEVEN NERAYOFF and MICHAEL HLADY at NERAYOFF's home in Great Neck, New York.  Due to

---

[105] Ibid at ¶ 23.

[106] Mr. Nerayoff did not introduce "Peters" to Jane Doe and John Doe in early March while according to the government Mr. Nerayoff was allegedly extorting them (rather than requesting that they honor the November 7, 2017 agreement). Jane Doe and John Doe had met "Peters" in mid- February 2018 at a conference that they attended with Mr. Nerayoff in Fort Lauderdale, Florida.  Also as noted above, the fact that "Peters" used an alchemist email address is of no import—both Jane Doe and John Doe had alchemist email addresses as the parties had been in discussions about Alchemist acquiring Company 1 and both working for Mr. Nerayoff at Alchemist.

a snowstorm, Jane Doe was unable depart New York on a flight as scheduled.  Instead, Jane Doe stayed at NERAYOFF's house on the evening of March 21, 2018, and through March 22, 2018.[107]"

129.    The fact that she visited and it snowed is true, but what the affidavit omits is that Jane Doe came to Great Neck to house hunt as it was her stated desire to move to the same town that Mr. Nerayoff lived in and Alchemist was headquartered in, to work for Alchemist whether Company 1 was acquired by Mr. Nerayoff or not.

130.    S/A Anderson further swore [i]n the middle of the night, on approximately March 22, 2018, the defendant MICHAEL HLADY walked into the room where Jane Doe was sleeping by herself. HLADY turned on the lights, pulled a up a chair to the bed[108] where Jane Doe had been sleeping and told Jane Doe, in sum and substance, that if Company 1 did not agree to his demands, which included, among other things, a demand for $10,000,000 and a large amount of Company 1 tokens, then "we will crush you," by, among other things, driving down the price of Company 1's tokens.  At some point later that night, the defendant STEVEN NERAYOFF also entered the room. He told Jane Doe, in sum and substance, that he would destroy her and Company 1, but that he did not want to, and asked Jane Doe if she wanted to, in sum and substance, thrive or be destroyed. Shortly thereafter, NERAYOFF and HLADY demanded that Company 1 provide a purported 10,000 ETH loan to NERAYOFF.[109]"

---

[107] Ibid at ¶ 24.

[108] The allegation that Hlady "pulled a chair up" to deliver the allegedly extortionate threat to Jane Doe, which we also submit is a work of fiction unworthy of any discussion at length (other than to state we've provided information to the government that it simply did not happen—as the witness the government has declined to interview would tell them), is similar to the conduct charged as part of a Hobbs Act extortion in *United States v. Orlando*, 819 F.3d 1016, 1020 (7th Cir. 2016).

[109] Ibid at ¶ 25.

131.    This too simply did not happen.  Although defendant is not fortunate to have video recordings to refute this lie, it is a lie that Jane Doe was alone as there was in fact another person in the very small room sharing the bedroom — the individual who had driven Jane Doe from the airport to Mr. Nerayoff's apartment and had been showing Jane Doe Great Neck during her stay —took Jane Doe to see homes and the local neighborhood. Although Mr. Nerayoff has offered to make the witness available to the government for an interview, to date, the government has declined Mr. Nerayoff's offer to interview this witness.

132.    S/A Anderson also swore, "[o]n other occasions, the defendants STEVEN NERAYOFF and MICHAEL HLADY made additional threats to Jane Doe and John Doe.  For example, HLADY told Jane Doe he was aware of her work-related issues at a different company and knew where her child went to school.  NERAYOFF and HLADY also threatened to expose Company 1 to potential litigation.[110]" Whatever Hlady may or may not have told Jane Doe was of no import to Mr. Nerayoff, what is important is that there is no suggestion that Mr. Nerayoff was aware of this and the affidavit falsely cast Hlady as Mr. Nerayoff's co-conspirator.

133.    That Mr. Nerayoff and Hlady threatened to "expose Company 1 to potential litigation" is of course not a crime when that litigation related to Jane Doe, John Doe and Company 1's breach of contract—which by March of 2018 can only be said to have been intentional and willful and in the area of hundreds of millions of dollars in damages to Mr. Nerayoff.

134.    S/A Anderson further swore, "[b]etween approximately March 27, 2018 and March 28, 2018, as the defendant MICHAEL HLADY was moving through John F. Kennedy International Airport to fly to Cancun, Mexico, HLADY sent a series of "iMessages" to Jane Doe primarily regarding the loan. One of the messages that HLADY sent to Jane Doe said the following,

---

[110] Ibid at ¶ 26.

in sum and substance: [Jane Doe] fix this by the time I land or I promise I will destroy your community. (1) we will go public with Stevens holding. (2) we will sell and get everyone we know to sell. (3) we will sue you. (4) a story will be written about [Company 1]. You are stalling for stalling's sake. I will be landing in 4hrs I expect you and [John Doe] on the phone. Also I want the "manual" you wrote today!! (**Ibid** at ¶ 27).

135.    As noted herein above, Mr. Nerayoff had been threatening to bring a lawsuit to assert a civil claim, however that is not a crime.[111]

136.    S/A Anderson also swore "[a]s a direct result of these threats, on or about and between March 28, 2018 and April 1, 2018, John Doe instructed a Company 1 employee to transfer 10,000 ETH to the defendant STEVEN NERAYOFF as a loan. Despite repeated requests in approximately May 2018 through August 2018 to NERAYOFF and the defendant STEVEN HLADY, NERAYOFF refused to pay back the 10,000 ETH loan."   (**Ibid** at ¶ 28).

137.    Again, a threat to commence litigation to assert a valid claim is not a crime, and Mr. Nerayoff, in the May 15, 2018 conversation with Jane Doe and John Doe, which was recorded by the FBI, consistent with his March 31, 2018 email confirming the terms of the "loan" to Jane Doe and John Doe,  advised them to sell the tokens he had provided as collateral to satisfy the debt—thus satisfying the terms of the loan.

138.    S/A Anderson's affidavit similarly strung together several "Other Threats," which were equally untrue or at minimum misleading.  Swearing "[t]he defendant STEVEN NERAYOFF

---

[111] There is no evidence that Mr. Nerayoff authored the message or directed Hlady to send it nor has the government suggested that Mr. Nerayoff did so.  The 'threats' themselves are for the most part non-sensical-- Mr. Nerayoff could not sell all his tokens, he had no control over them, that was the very reason for the dispute—that Company 1 and Jane Doe and John Doe had refused to release to him Company 1 tokens that had a value well above $100 million dollars or so at the time.  Also, unbeknownst to Hlady who came on to the scene after the crowd sale was completed, most of the sale participants that Mr. Nerayoff had brought in were believed to have sold their tokens already—a fact that John Doe and Jane Doe would be well aware.

also made clear to Jane Doe[112] that he wanted to acquire Company 1. On or about May 10, 2018, NERAYOFF wrote an email to HLADY and Co-Conspirator 1, which stated in part: *Something has to be done to explain when they [i.e., Jane Doe and John Doe] make a deal they stick to it regardless of the consequences. And then when we renegotiate they stick to that deal. Enough is enough. We are acquiring them and going to make them fucking rich as hell and she [i.e., Jane Doe] will pay off everything and get what she would never have without us so tell her to chill out. We will blow them out as a protocol and they will be part of Alchemist.*" (Ibid at ¶ 29).

139.    Of course, as noted herein above, Mr. Nerayoff was indeed looking to acquire Company 1 in a lawful arms-length transaction. In fact, in anticipation of the acquisition, and upon their request, both Jane Doe and John Doe had been given @alchemist.com email addresses and Jane Doe had even received an Alchemist credit card.[113]   Even assuming *arguendo* that S/A Anderson didn't know that one fact, he omitted the remainder of the email which made clear that Mr. Nerayoff was not threatening at all.  The full email[114] which was sent to "Peters" and cc'd Jeff Pulver, whom Anderson identified as "Co-Conspirator 1," read:

> She is beyond pissing me off. I invited [sic] her and [John Doe] to a very elite thing we are sponsoring and nothing back.  This was in response to a weird text from here.  Something has to be done to explain when they make a deal they stick to it regardless of the consequences. And then when we renegotiate they stick to that deal. Enough is enough. We are acquiring them and going to make them fucking rich as hell and she will pay off everything and get what she would never have without us so tell her to chill out.  We will blow them out as a protocol and they will be part of Alchemist. And we have to decide if [John Doe] is helping on deals. We really need to all four of us sit down and come to an understanding.  This doesn't change any of the old stuff (mind you I have not received a single token

---

[112] How exactly did Mr. Nerayoff make anything clear to Jane Doe in an email she didn't receive?

[113] On March 12, 2018 at 3:59 p.m. Jane Doe emailed Mr. Nerayoff and asked if she and John Doe could receive Alchemist emails. At 5:47 p.m. that same day Jane Doe and John Doe were notified by email that they had been issued alchemist email addresses (See **Exhibit 26**) and around that time, in anticipation of the merger John Doe was invited to participate in regular Alchemist meetings (See **Exhibit 27**).

[114] See **Exhibit 54**.

they are holding everything other than what I actually paid for like everyone else).[115]  Let's set a time to discuss with them.  It may turn out that we acquire them but she refuses to help Alchemist.  Would be a bad decision on her behalf because she can make a lot of money but we have to move on if that's the case and she can stay focused on [Company 1] which isn't the worst thing in the world if we are turning them into a protocol.  Her and [John Doe] can promote that and be heros [sic].

140.    S/A Anderson further swore, "[o]n approximately May 15, 2018, John Doe and Jane Doe attended a meeting in a hotel room in New York City, with the defendants STEVEN NERAYOFF and MICHAEL HLADY, along with Co-Conspirator 1 and other individuals working for NERAYOFF. During the meeting: (1) NERAYOFF confirmed that he knew of HLADY's threat to "destroy" Company 1; and (2) one of NERAYOFF's employees stated that they were running an "intervention" with NERAYOFF, and that with exception of NERAYOFF, they were not "ganging up" on Jane Doe and John Doe." (Ibid. at ¶ 30).

141.    This statement grossly distorts what actually happened, in that as noted herein above, during that meeting, Mr. Nerayoff stated he had not threatened Jane Doe and John Doe, but that he knew that Hlady had — a fact which Hlady likely aware that the meeting was being recorded gleefully admitted thrice — although Mr. Nerayoff's knowledge of the nature of the threat and its timing is not reflected in the call.  A threat of course to institute litigation is not a threat punishable by law if that litigation is related to a claim of right of course.  The "ganging up" and "intervention" are clearly figures of speech apparently made in jest by Alex Feldman, a friend of Mr. Nerayoff who was at the meeting, as a way to cut the tension in the room and S/A Anderson's account omits that Mr. Nerayoff, consistent with the March 2018 agreement, told John Doe and Jane Doe to sell the tokens he had pledged as collateral for the 10,000 ETH.

---

[115] A reference to 1,250 Ether worth of Company 1 tokens that Mr. Nerayoff bought during the presale/crowdsale.

## Mr. Nerayoff's Arrest and Subsequent Developments

142.    On September 19, 2019, S/A Anderson and a team of agents, appeared at Mr. Nerayoff's residence and arrested him. When they encountered Mr. Nerayoff, they tried to have him turn his face to face his iPhone and then asked what the passcode was as they held it up to his face, both apparently in an attempt to unlock the phone. Upon being arrested, S/A Anderson handcuffed Mr. Nerayoff and took him into a van that was parked outside the residence.  Once in the van, S/A Anderson told Mr. Nerayoff, in sum and substance, that Mr. Nerayoff was facing a lengthy prison sentence and that if he wanted to see his kids grow older (at the time of the arrest Mr. Nerayoff's children were not even teenagers), he has to cooperate with the government and help bring cases against other influencers in the crypto industry.  S/A Anderson explained further that he wanted Mr. Nerayoff to assist the government in making dozens of convictions of the top players in the crypto industry, and that Mr. Nerayoff would get time off his prison sentence for each conviction he helped the government obtain.  S/A Anderson went so far as to show Mr. Nerayoff a list with hundreds of individuals he was seeking to make cases against.

143.    While sitting on the floor of the van, Mr. Nerayoff reviewed the list noticing that most of the people on the list had nothing to do with Company 1, the company he was just falsely arrested for allegedly extorting.  Rather, they were important and well-known members of the Crypto community.  While the list was many pages, *some* of the names Mr. Nerayoff can remember to the best of his recollection are:

> Vitalik Butterin, Charles Hoskinson, Patrick Byrne, Anthony Di Lorio, Brian Kelly, Mike Novagratz, Joe Lubin, Brock Pierce, Scott Walker, Amir Chetrit, Dino Mark, Guy Benartzi, Ned Scott, Bruce Fenton, David Namdar, Ivan Brightly, Peter Getz, David Wachsman, Vlad Zamfir, Tom Bollich, Matt Spoke, Ari Paul, Ran Neuner, Charlie Schrem, Adam Helfgott, Micah Spruill, Benet Copeland, Barry Silbert, Roger Ver, Gabriel Abed, David

Johnson, Trevor Koverko, Matt Rozak, Brad Mills, Joseph Weinberg, Satoshi Kaboyashi, Caitlin Long, CZ, Fran Strajar, James Andrew, Naomi Brockwell, Tatiana Moroz, David Bailey, Brad Chun, Nick Spanos, Steve Kokinos, Alex Shin, Alex Dreyfuss, Diego Gutierrez Zaldivar, Zooko Wilcox, and Ricardo Spagni.

144.    Mr. Nerayoff was shocked over the size and breath of the list.  It seems that the government had compiled a list of the top players in the crypto industry and they were looking for "anything on anyone." Some of the people on the list were close his friends for whom he could vouch, while others were acquaintances who to the best of his knowledge were decent and honest entrepreneurs.

145.    Mr. Nerayoff did not respond to S/A Anderson's request for information, rather, Mr. Nerayoff simply remained silent.  Mr. Nerayoff refused to cooperate or provide information on anyone (other than John Doe & Jane Doe), at that time or during the 3 ½  years since his arrest, despite continuous forceful pressure by the DOJ, as he believed this was a witch-hunt against the crypto industry.

146.    We believe that S/A Anderson's interest in the crypto industry, and Hlady's work for S/A Anderson, also included providing information on Mr. Nerayoff's meetings with other large players in the industry.  For example, on July 2, 2018, prior to and during Mr. Nerayoff's meeting with Joseph Lubin, a major player in the Crypto world who appeared on S/A Andersons' list, Hlady sent a total of 13 texts to and received 4 texts from S/A Anderson's Cell Phone. Hlady also called S/A Anderson's Cell Phone for a call that lasted 60 seconds.  Lubin is a co-founder of Ethereum and the founder of ConsenSys.[116]

147.    Curiously, the day after Mr. Nerayoff's arrest, on September 20, 2019, the criminal investigation against Jonathan Lucas that S/A Anderson and former AUSA Mark Bini had initially

---

[116] see, https://consensys.net/about/joseph-lubin-founder-of-consensys/

questioned Mr. Nerayoff about, was resolved by way of a civil settlement with the SEC. What is remarkable about the settlement is that the complaint and the settlement were filed on the same day (so obviously Lucas and the government had a settlement ready to be filed, which raises the inference that they delayed it until Mr. Nerayoff's arrest), and the Complaint was filed in the Southern District of New York, not the Eastern District of New York, where the subpoena Mr. Nerayoff had received was returnable.[117]

### **The Indictment**

148.    On January 10, 2020, unable to obtain Mr. Nerayoff's cooperation, the government filed the instant four count indictment against Mr. Nerayoff and Michael Hlady which charged them for acts in connection with an extortion scheme to obtain property from Company 1.[118]

149.    Count 1 of the Indictment charged a Hobbs Act Extortion Conspiracy which allegedly spanned from June 2017 through November 2018. Count 1 alleged that "In or about and between June 2017 and November 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEVEN NERAYOFF and MICHAEL HLADY, also known as "Michael Peters," together with others, did knowingly and intentionally conspire to obstruct, delay and affect commerce, and the movement of articles and commodities in commerce, by extortion, in that the defendants and others agreed to obtain property, to wit: virtual currency, from John Doe and Jane Doe, individuals whose identities are known to the Grand Jury, with their consent, which consent was to be induced by wrongful use of actual or threatened force; violence and fear." As detailed above, the property obtained by Mr.

---

[117] https://www.sec.gov/litigation/litreleases/2019/lr24607.htm

[118] **Exhibit 55**: Indictment.

Nerayoff was the result of a freely entered into contractual agreement and these allegations were false.

150.    Count 2 of the indictment charged a Hobbs Act Extortion which allegedly occurred between October 2017 and November 7, 2017.  Count 2 alleged that "In or about and between October 2017 and November 7, 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant STEVEN NERAYOFF, together with others, did knowingly and intentionally obstruct, delay and affect commerce, and the movement of articles and commodities in commerce, by extortion, in that the defendant and others obtained property, to wit: virtual currency, from John Doe and Jane Doe with their consent, which consent was to be induced by wrongful use of actual or threatened force, violence and fear." As detailed above, the property obtained by Mr. Nerayoff was the result of a freely entered into contractual agreement and these allegations were false.

151.    Count 3 of the indictment charged a Hobbs Act Extortion which allegedly occurred in March of 2018. Count 3 alleged that "In or about March 2018, within the Eastern District of New York and elsewhere, the defendants STEVEN NERA YOFF and MICHAEL HLADY, also known as "Michael Peters," together with others, did knowingly and intentionally obstruct, delay and affect commerce, and the movement of articles and commodities in commerce, by extortion, in that the defendants and others obtained· property, to wit: virtual currency, from John Doe and Jane Doe with their consent, which consent was to be induced by wrongful use of actual or threatened force, violence and fear." As detailed above, the property obtained by Mr. Nerayoff was the result of a freely entered into contractual agreement and the allegations were false.

152.    Count 4 of the indictment charged a Conspiracy to Transmit Interstate Communications with Intent to Extort between on or about March 22, 2018 and March 28, 2018.

Count 4 alleged "On or about and between March 22, 2018 and March 28, 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEVEN NERAYOFF and MICHAEL HLADY, also known as "Michael Peters," together with others, did knowingly and willfully conspire, with intent to extort from John Doe, Jane Doe and Company 1, an entity the identity of which is known to the Grand Jury, money and one or more things of value, to transmit in interstate and foreign commerce one or more communications containing one or more threats to injure the property and reputation of John Doe, Jane Doe and Company 1."   Count 4 alleged the following overt acts allegedly committed by Mr. Nerayoff and Hlady to advance the conspiracy:

(a) On or about March 22, 2018, NERAYOFF and HLADY walked into a room in Great Neck, New York, where Jane Doe was sleeping and, in sum and substance, threatened to "destroy" both her and Company 1 if Company 1 did not provide NERAYOFF with money and virtual currency.

(b) On or about March 27, 2018, HLADY sent Jane Doe a text message asking Jane Doe whether Company 1 had reached a decision about providing NERAYOFF with virtual currency.

I On or about March 27, 2018, HLADY sent Jane Doe a text message in which he stated, in sum and substance, that NERAYOFF needed an answer from Company 1 that night.

(d) On or about March 27, 2018, HLADY sent Jane Doe a text message in which he, in sum and substance, requested "a "loan" for virtual currency on behalf of NERAYOFF.

(e) On or about March 28, 2018, HLADY sent Jane Doe a text message in which he, in sum and substance, threatened "to destroy" Company 1 if Company 1 did not agree to his demands.

(f) On or about March 28, 2018, HLADY sent Jane Doe a text message in which he, in sum and substance, stated that HLADY didn't "like being tough."

As detailed *above,* each of these allegations are based, point by point, upon the affidavit of S/A Anderson and are either misleading or worse yet, outright false.  It is not improbable to think that the Grand Jury was misled by person(s) who knowingly presented perjurious information. As such, as argued in the accompanying Memorandum of Law, we request that this case calls for the Court to take the extraordinary act of disclosing certain portions of the  Grand Jury transcripts to Mr. Nerayoff.

### Hlady's Guilty Plea

153.    On April 5, 2021, Hlady appeared before the Court and pleaded guilty to Count 1 of the indictment charging a Hobbs Act Conspiracy pursuant to a plea agreement with the government.[119]   Notwithstanding the fact that Hlady had zero personal knowledge of the events that transpired in Mr. Nerayoff's personal or business life prior to his meeting Mr. Nerayoff in late December 2017[120], and that in fact, Mr. Nerayoff's entire course and scope of dealings with Jane Doe, John Doe and Company 1 were not criminal and that it was Mr. Nerayoff who was the victim of a massive fraud committed by Jane Doe, John Doe and Company 1, Hlady stated under oath that:

> "In the end of 2017 and 2018 I agreed, with another to obtain money from a
> business person that's identified in the indictment by threatening economic harm to
> the person's business, company and if they did not provide a loan to my

---

[119] While we are not privy to the terms of the plea agreement that Hlady entered into with the government, we believe that as part of Hlady's plea inculpating Mr. Nerayoff the government promised Hlady that they would not prosecute him for any criminal conduct committed against Mr. Nerayoff detailed herein above and the criminal conduct that Hlady committed while this case was pending, that the government extensively detailed to the Court in a September 23, 2020 letter the government submitted to the Court seeking modification of Hlady's bail conditions (Case 1:20-cr-00008-MKB Document 50 Filed 09/23/20 Remand Motion) along with the numerous other criminal activity conducted by Hlady.

[120] As noted above, during the staged May 18, 2018 recording Hlady admitted "no I don't know what happened before I was involved."

coconspirator named in the indictment, my co-conspirator didn't have any right, any lawful right to demand the money. In furtherance of that agreement, while I was at JFK Airport in Queens, I sent a text to the business person in which I threatened damage to destroy the person's business if the loan was not promptly provided."

**Information provided to and requested from the Government**

154.   On June 2, 2022, myself, and Mr. Nerayoff's former counsel Marc Agnifilo and Zach Intrater for the first time raised the issue of Hlady's extensive contacts with S/A Anderson during a meeting with the then new prosecutor that we believed he might not be aware of.

155.   On June 21, 2022, myself and Messrs. Agnifilo and Intrater met with members of the United States Attorney's staff and provided them with a flash drive containing the incontrovertible video evidence that established Mr. Nerayoff did not obtain the November 6, 2017 agreement by way of extortionate conduct, but rather it was the product of lawful arms-length business negotiations.  That flash drive also included the messages referenced herein which also establish that the 10,000 ETH that Mr. Nerayoff received from Company 1 was also not obtained via extortion.  We thereafter continued a dialogue with the government that lasted until January 20, 2023.

156.   On July 1, 2022, we provided the government with a timeline of relevant events surrounding Mr. Nerayoff's interaction with Company 1, John Doe and Jane Doe.

157.   On July 18, 2022, Mr. Agnifilo requested certain information and documents from the government in connection with our discussions.[121]   Given that the parties were at this point still in discussions to resolve the matter short of a guilty plea, we did not at that time ask the government to reply to the demand.

---

[121]**Exhibit 56**: July 18, 2022 Agnifilo demand.

158.    On August 26, 2022, we provided the government with a letter and supporting documents that focused on the 10,000 ETH that Mr. Nerayoff received from Company 1 in April of 2018.  Those supporting documents included the messages referenced herein above in which John Doe offered a "loan" of 10,000 ETH as Company 1 could not provide Mr. Nerayoff with any of his 1.35 billion tokens.

159.    Sometime during this period, Marl Bini, the former AUSA who had led the investigation into and obtained the indictment against Mr. Nerayoff and Hlady, changed one of the entries in his bio at the law firm he works at from "United States v. Nerayoff et al-investigation and prosecution of the first-ever charged economic extortion of a crypto company, where the defendants extorted $8 million dollars of Ether from a crypto company," to "United Stated v Hlady-investigation and prosecution of the first-ever charged economic extortion of a crypto company, where the defendants extorted $8 million dollar of Ether from a crypto company."

160.    On January 20, 2023, Mr. Nerayoff and the government came to the conclusion that despite the parties' six months of discussions regarding a resolution of this matter that did not involve a guilty plea that no agreement would be reached.  Significantly, the government required a disposition of the case against Mr. Nerayoff to include a broad waiver of his rights to bring suit against the government, which Mr. Nerayoff was unwilling to agree to and which read as follows:

> "…waive[s] any and all claims for relief, demands, rights, and causes of action of whatsoever kind and nature arising from, and by reason of any and all known and unknown, foreseen and unforeseen, personal injury and monetary damage and the consequences thereof which he may have or hereafter acquire against the United States of America and its agents, servants, and employees in connection with or on account of the captioned case and its subject matter…"

The government made this waiver a requirement to any disposition and was unwilling to end the prosecution of Nerayoff without this waiver, calling it a "deal-breaker." [122]

161.     On January 23, 2023, I emailed the government and asked them to respond to Mr. Agnifilo's July 18, 2022 request and as well as a request I sent them that day. [123]   On February 6, 2023 I emailed the government and asked if they could respond to those letters by Friday February 10, 2023 as Mr. Nerayoff's motion was due to be filed on February 13, 2023.

162.     As noted above, on February 10, 2023 I spoke with AUSA John Enright regarding the two unanswered requests. In addition to the information sought relating to Hlady and the FBI, I asked AUSA Enright if the government any additional statements that Mr. Nerayoff had made to the government that had not yet been provided, and if the government would be able to provide a copy of an inventory of what had been obtained from Mr. Nerayoff's Apple iCloud account via subpoena in February of 2019 and if in fact the government had obtained the three Skype Business Meeting videos that support his actual innocence.

163.     AUSA Enright did not directly respond to the question but noted that the government can only obtain content from search warrants and not subpoenas.  We do not believe that the issuance of a subpoena, rather than a search warrant, would necessarily restrict the government's ability to obtain non-content as according to the Justice Department's Computer Crime manual, agents can obtain opened and sent email (and other stored electronic or wire communications in "electronic storage" more than 180 days) and retrieved communications and

---

[122] While Rule 408 of the Federal Rules of Evidence generally limits the admissibility of offers to compromise, it is not "a blanket rule of inadmissibility."  Rule 408 merely states that evidence of an offer to compromise a claim is not receivable in evidence as an admission against a party.  *See, Hart v. RCI Hospitality Holdings, Inc*., 90 F. Supp. 3d 250 (SDNY 2015).   Here the information is not provided in connection with the guilt or innocence of the Defendant or the strength or weakness of the government's case, but rather to establish the possible knowledge of the government as to material issues related to this motion.

[123] See **Exhibit 57**

the content of other stored files using a mere subpoena, provided they comply with applicable Stored Communication Act notice provisions—which includes delaying prior notification to the customer or subscriber for ninety day periods based upon a supervisory official's written certification that the existence of the subpoena may have an adverse effect —which is what the FBI apparently did when they served Apple with a subpoena and Apple delayed notifying Mr. Nerayoff until after he was indicted in 2020.

164.     Prior to Mr. Nerayoff's arrest the government was in possession of allegations— false to be sure—that Mr. Nerayoff had extorted Company 1, Jane Doe and John Doe.  In fact, those same false allegations formed the basis for S/A Anderson's complaint in support of Mr. Nerayoff's September 2019 arrest.  The government was also aware that both John Doe and Jane Doe were familiar with how Mr. Nerayoff operated from his home and work offices and used his computer to conduct business.   It thus seems odd that given this knowledge that the government did not obtain a search warrant for Mr. Nerayoff's iPhone, Cloud Data, or his home and office computers, particularly in a case that former AUSA Bini listed on his law firm's bio page as "...the first-ever charged economic extortion of a crypto company."

165.     As seeking search warrants in this instance would clearly be a normal investigatory step that the FBI Agents and Assistant United States assigned to the investigation could easily obtain, we are left to draw the only logical conclusion: perhaps the government did not wish to obtain any further evidence of Mr. Nerayoff's innocence than they already possessed.

166.     For all these reasons and the argument presented in the accompanying Memorandum of Law, Mr. Nerayoff requests that the Court dismiss the indictment against him with prejudice.  We submit that the evidence establishes that Mr. Nerayoff's dealings with Company 1 and its executives consisted of entirely lawful business activity, that the grand jury

was misled by the introduction of testimony that was materially false and perjurious and that the government knew or should have known that Mr. Nerayoff was innocent at least eleven months prior to the presentation to the grand jury—yet for reasons only known to the government, they pressed forward to indict and now appear ready to press forward to a trial of a matter in which there was no crime.

Dated:  Port Washington, New York
        February 13, 2023

By: /s/ Michael A. Scotto
Michael A. Scotto